**Steven GRAVATT and Delores Gravatt, Plaintiffs,**

v.

**The CITY OF NEW YORK, Simpson & Brown, Inc., N. Massand, P.E., L.S., P.C., a/k/a Nanik Massand, P.E., Barge "ABC" and Barge Def, their engines, boilers, tackle, etc., in rem, Defendants.**

**No. 97 Civ. 0354(RWS).**

United States District Court, S.D. New York.

May 24, 1999.

Waesche, Scheinbaum & O'Regan, P.C., New York City, by Nicholas P. Giuliano, William Bennett, III, Claurisse Campanale–Orozco, of counsel, for plaintiffs.

Chalos & Brown, New York City, by Robert J. Seminara, Fred Wexler, of counsel, for defendant City of New York.

Freehill, Hogan & Mahar, New York City, by John J. Walsh, of counsel, for defendant Simpson & Brown, Inc.

Baer Marks & Upham, New York City, by Eugene R. Scheiman, Daniel J. Friedman, of counsel, for defendant N. Massand.

## OPINION

SWEET, District Judge.

Plaintiffs Steven Gravatt ("Gravatt") and his wife Delores Gravatt ("Mrs.Gravatt") (collectively the "Gravatts") have moved under Rule 52(b), Fed.R.Civ.P., to amend the opinion filed in this action on March 3, 1999 (the "Opinion") directing judgment in favor of the Gravatts against defendants the City of New York (the "City") Simpson & Brown, Inc. ("S & B"), the employer of Gravatt, and N. Massand, P.C. ("Mas-

sand"), an engineering firm (collectively the "Defendants") and in favor of the City on its cross-claim for indemnity against S & B and Massand and dismissing Massand's cross-claim against S & B.

The Defendants have opposed the motion which will be granted for the reasons set forth below. A revised opinion will be filed to reflect the conclusions reached below.

### Prior Proceedings

Gravatt's injury on January 31, 1996, while employed as a dock worker for S & B on a job for the City, engineered by Massand, gave rise to this action, the complexity of which far exceeds the relatively simple facts surrounding the injury to Gravatt's ankle. The proceedings prior to the Opinion, which regrettably failed to resolve all the issues presented, were set forth in the Opinion, pages 2–4, see Gravatt v. The City of New York, 1999 WL 111922 (S.D.N.Y. March 3, 1999), and familiarity with that Opinion and all prior decisions is presumed. See Gravatt v. The City of New York, 1997 WL 419955 (S.D.N.Y. July 28, 1997); Gravatt v. The City of New York, 1998 WL 171491 (S.D.N.Y. April 10, 1998); Gravatt v. The City of New York, 1998 WL 341941 (S.D.N.Y. June 26, 1998); Gravatt v. The City of New York, 17, F.Supp.2d 247 (S.D.N.Y.1998); Gravatt v. General Star Indemnity Co., 1998 WL 842351 (S.D.N.Y. December 2, 1998); Gravatt v. General Star Indemnity Co., 1999 WL 212681 (S.D.N.Y. April 13, 1999).

The Opinion was rendered after a trial of over ten trial days during which the testimony of nineteen witnesses was taken and hundreds of exhibits were introduced.

The instant motion to amend certain of the findings of fact and conclusions of law contained in the Opinion was heard and considered fully submitted on April 21, 1999.

### Contributory Negligence Cannot be Attributed to Gravatt

The facts found with respect to Gravatt's contributory negligence were as follows:

Gravatt contributed to his injuries. Although four drafts had been successfully removed prior to the accident, it was unsafe to use timber tongs to move the old pilings. Gravatt as an experienced dock worker knew or should have known that the work he was performing with the timber tongs was being done in a hazardous fashion. Further, Gravatt turned his back on the lift as he moved the draft of new lumber. His negligence was attributable to one-third of his injury.

The Opinion, page 413.

After stating the conclusion that the Gravatts were entitled to recover against the City and Massand under §§ 200, 240 and 241 of the Labor Law of the State of New York, and against S & B under § 905(b) of the Longshoreman and Harbor Workers Compensation Act (the "LHWCA") and the maritime law, the Opinion addressed the defense of contributory negligence raised by the Defendants as follows:

As found above, Gravatt was contributorily negligent. He was a journeyman dockbuilder i.e., a qualified and experienced dockbuilder. Although he was following instructions when he attempted to move the pile using just timber tongs, he knew or should have known that the use of timber tongs to lift the pile was unsafe. See Fuszek v. Royal King Fisheries, Inc., 98 F.3d 514 (9th Cir.1996); Jackson v. Lloyd Brasileirs Patrimonio Nacional, 324 F.Supp. 556, 563 (S.D.Tex.1970); Simpson v. Royal Rotterdam Lloyd, 225 F.Supp. 947, 950 (S.D.N.Y.1964).

The Opinion, page 424.

Upon reexamination, the authorities cited require a different conclusion for an employee such as Gravatt performing a task at the specific direction of his employer.

As the Opinion found and the testimony established, and as stated in the companion opinion, Gerhard Holzheuer ("Hol-

zheuer") was the S & B foreman directly supervising Gravatt and his co-worker, Thomas Liming ("Liming"), and Gravatt and Liming were complying with Holzheuer's direction to use timber tongs to move old pilings in order to gain access to a new draft of lumber which was to be moved. The old pilings slipped, the load fell, and Gravatt was consequently struck as set forth in the Opinion at pages 407–408.

▬ A correct interpretation of the cases cited in the Opinion compels the conclusion that an injured worker following the orders of his supervisor is not contributorily negligent, and any award for damages should not thereby be reduced as a consequence of his acts.

In *Fuszek v. Royal King Fisheries,* 98 F.3d 514 (9th Cir.1996), the plaintiff, a Jones Act seaman, was injured on board a fishing vessel while operating a fish processing machine. The plaintiff reached into the machine while it was operating (a dangerous practice implemented by his employer) and seriously cut his hand. The Court reduced plaintiff's award by twenty-five percent for contributory negligence. The Court of Appeals in reversing held that the plaintiff's recovery should not be reduced because the vessel owner maintained the vessel's equipment in violation of safety regulations. Although *Fuszek* involved a seaman protected by the Jones Act rather than a harbor worker protected by the LHWCA, it stands for the principle that a worker is not liable for injuries caused by following orders, as does *Simpson v. Royal Rotterdam Lloyd,* 225 F.Supp. 947 (S.D.N.Y.1964). There the plaintiff was a longshoreman who was injured on the defendant's vessel while unloading cargo in Brooklyn. He fractured his ankle when a 100 pound tin ingot fell on his foot during unloading operations. The Honorable Wilfred Feinberg, then a District Judge, stated "There was no contributory negligence on the part of the plaintiff. He was in the hold working *pur-*

*suant to instructions."* 225 F.Supp. at 950 (emphasis added).

In *Jackson v. Lloyd Brasileirs Patrimonio Nacional,* 324 F.Supp. 556 (S.D.Tex. 1970), the plaintiff longshoreman was injured when a malfunctioning winch caused the plaintiff to be struck by a 55 gallon drum. The Court found that the plaintiff, like Gravatt, was an experienced worker, that the defendants, like the City, Massand and S & B, knew about the defective practice, and that the plaintiff also knew about the defect. The Court wrote:

> In this case Jackson's continued performance of his assigned task—knowing it to be a potentially dangerous one—did not constitute contributory negligence. He was ordered to assume the guide position by his employer's supervisors. If Jackson had refused to perform his assigned task, it is reasonable for this Court to infer that his future employment as a longshoreman in Galveston, Texas, would have been jeopardized. As the accident occurred suddenly and without warning, Jackson did all that he could under the circumstances to protect himself from injury.

324 F.Supp. at 563.

Here, a former shop steward, Matthew Quesada ("Quesada") had complained about safety and believed that he lost his job because of his safety complaints, and Gravatt believed that too. The contract between the City and S & B specifically provided that an employee could be discharged for disobedience. "[W]henever the Commissioner shall inform the Contractor, in writing, that any employee is ... disobedient, he shall be discharged ... forthwith, and shall not again be employed upon it...." Agreement, Chap. VIII, Art. 34, at 56.

In addition, Gravatt and Liming intended to move the old piles with slings instead of tongs but used the tongs because of Holzheuer's order.

In *Earl v. Bouchard Transp. Co., Inc.,* 917 F.2d 1320 (2d Cir.1990), a seaman's

case like *Fuszek*, the plaintiff was a tugboat deckhand injured while following his captain's order. The Honorable Jack B. Weinstein instructed the jury that if the plaintiff was following his supervisor's order, he could not be found contributorily negligent, even if he knew the activity he was ordered to do was dangerous. On appeal, the defendant argued that Judge Weinstein's instruction was fundamental error because the phrase "following orders of his supervisors" was too easily misconstrued. The Court affirmed the judgment and found no error in the jury instruction:

> We find no error in Judge Weinstein's instructions, much less "plain error." The instruction on contributory negligence was clearly in accord with the law of this circuit. Indeed, in *Darlington v. National Bulk Carriers Inc.*, 157 F.2d 817 (2d Cir.1946), Judge Frank, writing for a unanimous panel that included Judges Swan and Learned Hand, reversed a defendant's verdict, because the district court had refused to give this substantially similar charge:

> "The plaintiff was found to obey the orders of his superiors on board the vessel. The chief officer was the plaintiff's superior and plaintiff was bound to obey the orders of the chief officer. Even though the orders of the chief officer required him to work with unsafe tools or under unsafe conditions, the plaintiff was obliged to obey the orders and did not assume any risk of obedience to orders."

> *Id.* at 819. It cannot have been plain error for Judge Weinstein to give an instruction that is so similar to the instruction that the district court in *Darlington* was reversed for failing to give.

*Earl*, 917 F.2d at 1324 (quotation marks added).

The previous conclusion reached in the Opinion was contrary to the relevant authority, and no contributory negligence can be attributed to Gravatt who was following a direct order causally linked to his injury.

### Punitive Damages Are Recoverable Against S & B

█ The Gravatts seek amendment of the Opinion to permit a recovery of punitive damages against S & B. In the Opinion it was concluded that the acts of S & B were wanton and reckless and that it was more culpable than Massand, which was held liable for punitive damage liability under New York law (Opinion, page 425. The Opinion stated:

> It seems anomalous under these facts that a remedy under general maritime law cannot equal those granted (or limited) by state statute. However, the LHWCA creates a worker's compensation scheme for certain maritime workers that is exclusive of other remedies and does not provide for punitive damages. 33 U.S.C. 901–950; *see also Miller v. American President Lines, Ltd.*, 989 F.2d 1450, 1458 (6th Cir.1993). Accordingly, punitive damages are unavailable against S & B.

Opinion at pages 425–426.

The issue of the availability of punitive damages has now been more precisely illuminated by the parties. The issue is difficult and close, and distinguished judges in this district have reached contrary results, the Honorable Bernard Newman concluding that punitive damages are not available in *Cochran v. A/H Battery Associates*, 909 F.Supp. 911, 920–23 (S.D.N.Y.1995) (Judge Newman also concluded the proof did not support the punitive damage claim), and the Honorable Jed B. Rakoff reaching the same conclusion in *O'Hara v. Celebrity Cruises, Inc.*, 979 F.Supp. 254 (S.D.N.Y. 1997), while the Honorable Allen G. Schwartz denied a motion to strike a similar punitive damage claim in a maritime cause in *Taylor v. Costa Cruises, Inc., et al.*, 90 Civ. 2630(AGS), unreported opinion, filed March 14, 1996, relying on his analysis of *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996).

Both the Gravatts and S & B agree on the legal issue, *i.e.*, whether an award of

punitive damages is permissible under general maritime law in a case involving non-fatal injuries to a harbor worker. S & B contended that *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) and cases interpreting it, including *Wahlstrom v. Kawasaki Heavy Industries, Ltd.,* 4 F.3d 1084 (2d Cir.1993), bar a punitive damages recovery under the general maritime law, and in the Opinion it was concluded that under the LHWCA the same conclusion should be reached. However, the Opinion also concluded that *Miles* does not preclude an award of punitive damages on all claims arising under the general maritime law.

On closer examination, it is now concluded *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), and *Kawasaki,* 4 F.3d 1084, do not compel acceptance of S & B's argument. *Kawasaki* involved a wrongful death action of a pleasure boat operator, *i.e.,* not a traditional seaman or harbor worker. This Court concluded in the Opinion:

> Massand and S & B rely on the reasoning of the Supreme Court's decision in *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), and dicta in the Second Circuit's decision in *Wahlstrom v. Kawasaki Heavy Industries Ltd.,* 4 F.3d 1084 (2d Cir.1993), for the proposition that punitive damages are not available in cases brought under general maritime law. While punitive damages against S & B are not appropriate in the instance case, Massand and S & B overstate the Supreme Court's holding in *Miles.*
>
> In *Miles,* the Court held, *inter alia,* that damages recoverable in an action for the wrongful death of a seaman do not include loss of society. *See Miles,* 498 U.S. at 37, 111 S.Ct. 317. In reaching this conclusion, the Court articulated principles of uniformity relevant to wrongful death actions, and more generally, to maritime tort law, which have moved subsequent courts to limit recovery in other similar contexts.

*See e.g., CEH, Inc. v. FV Seafarer,* 148 F.R.D. 469, 472 (D.R.I.1993) (collecting cases). The Supreme Court's decision in *Miles,* however, does not enunciate an absolute bar to recovery of punitive damages in all general maritime cases. Indeed, *Miles* does not signify a case for "universal uniformity of maritime tort remedy," but rather "emphasizes the importance of uniformity in the face of applicable legislation." *CEH, Inc. v. FV Seafarer,* 70 F.3d at 700. The concern expressed in Miles was not with respect to nonpecuniary damages in maritime cases in general, but with inconsistency with statutory law; "[i]n this era, an admiralty court should look primarily to these legislative enactments for policy guidance ... [and] must be vigilant not to overstep the well-considered boundaries imposed by federal legislation." *Miles,* 498 U.S. at 27, 111 S.Ct. 317. As the Supreme Court later held in *Yamaha Motor Corp. U.S.A. v. Calhoun,* 516 U.S. 199, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996), "[w]hen Congress has prescribed a comprehensive tort recovery regime to be uniformly applied, there is no cause for enlargement of the damages statutorily provided." 516 U.S. at 215, 116 S.Ct. 619.

Opinion at pages 425–426.

The anomaly of allowing punitive damages against Massand and not against S & B was recognized but it was concluded that the LHWCA, as a worker's compensation scheme, compelled this result. However, the legislative history of the LHWCA casts doubt on that conclusion. Congress apparently anticipated that the 905(b) action would place the vessel owner in the same position as a land-based third-party.

> The purpose of the [1972] amendments [to the LHWCA] is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow

him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as "unseaworthiness," "nondelegable duty," or the like.

H.R. Rep. 92–1441, at 4703 (1972), U.S.Code Cong. & Ad.News 1972.

It thus appears that Congress did not intend to create the anomalous result reported in the Opinion. Indeed, in *Miles,* a seaman was murdered aboard ship in state territorial waters. A claim for both survival and wrongful death damages alleged negligence under the Jones Act and for unseaworthiness under general maritime law.

The Supreme Court held that a non-dependent parent cannot recover loss of society damages and that the decedent's lost future income is not recoverable to the estate. The Supreme Court ruled that the applicable federal statutes, Death on the High Seas Act, 46 U.S.C. § 761 *et seq.* ("DOHSA") and the Jones Act, 46 U.S.C.A. § 688, limit damages to "pecuniary loss" in seamen's wrongful death and survival actions and, thus, precluded the murdered seaman's mother from recovering "non-pecuniary loss, such as loss of society," in a general maritime law action. *Miles,* 498 U.S. at 20, 111 S.Ct. 317, *quoting, Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974).

The Second Circuit in *Kawasaki,* where non-dependent parents of a recreational boater sued for non-pecuniary damages held that non-pecuniary loss of society damages were not available to non-dependent parents under general maritime law. Turning to punitive damages, the Second Circuit held that punitive damages, like loss of society, are "non-pecuniary" and, therefore, are unrecoverable in a wrongful death action based on general maritime law. The Court stated:

> We are in general agreement with the view that plaintiffs who are not allowed by general maritime law to seek non-pecuniary damages for loss of society should also be barred from seeking non-pecuniary punitive damages.

446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 *Kawasaki,* 4 F.3d at 1094.

The Gravatts contend that the corollary to this rule is that plaintiffs who are entitled to seek non-pecuniary damages for loss of society should be allowed to seek non-pecuniary punitive damages, citing *American Export Lines v. Alvez,* 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980) where it was held that non-pecuniary loss of society damages are available to the spouse of a harbor worker injured in state territorial waters:

> The question in this case is whether general maritime law authorizes the wife of a harbor worker injured *nonfatally* aboard a vessel in state territorial waters to maintain an action for damages for the loss of her husband's society. We conclude that general maritime law does afford the wife such a cause of action.

*Alvez,* 446 U.S. at 275–76, 100 S.Ct. 1673.

In the interest of congruence between state and federal law under the authorities cited above, and the requirements of justice under the particular facts of this case driven by questions of coverage, the conclusion stated in the Opinion must be amended to grant judgment against S & B on behalf of Gravatt on his claim for punitive damages.

Having previously concluded Massand's liability to be $200,000 and S & B to have more culpability than Massand (Opinion, pages 425–426), an award of $400,000 in punitive damages against S & B is appropriate. As set forth in the Findings of Fact in the Opinion, while Massand's principal dereliction was its failure to comply with contractual and statutory requirements and to provide inspection, particularly at the time of the action (Opinion, pages 403–405, 407), S & B's reckless conduct included not only the failure to meet the relevant safety requirements, but the particular instruction to use an unsafe pro-

cedure which resulted in the injury to Gravatt (Opinion, pages 399–402, 408–409).

### The Conclusion with Respect to Pain and Suffering is Controlling

The Opinion at page 414 found that $200,000 would ·compensate for past pain and suffering, and that $150,000 would compensate Gravatt for future pain and suffering. It was concluded at pages 424–425 of the Opinion that these amounts were respectively $300,000 and $200,000. The conclusions are correct and the findings are an unhappy error resulting from the drafting process.

### The Conclusions and Findings with Respect to Pain and Suffering and Household Services are Supported by the Evidence

Gravatt has moved to amend the conclusions with respect to pain and suffering, setting forth for the first time a number of state court cases in which plaintiffs with allegedly comparable injuries received greater awards than set forth in the Opinion. Those differences are narrowed by the arithmetical corrections set forth above. Massand has distinguished Gravatt's cases on the facts and has noted the absence of any appellate authority. S & B has set forth a number of cases with allegedly comparable injuries and lower awards.

After consideration of these authorities and both Gravatt's injuries and the condition of his ankle prior to January 31, 1996, the conclusions set forth in the Opinion as to past and future pain and suffering are supported by the record.[1]

█ The Gravatts cite Mrs. Gravatt's testimony to support their claim of household services lost as a consequence of Gravatt's injury. However, his injury, though permanent, affects only the mobility of his ankle and does not preclude performance of the tasks described by Mrs. Gravatt. In addition, Gravatt testified to performing certain household duties and to successful hunting trips on a number of occasions, an activity not inconsistent with mowing the grass. The record, viewed as a whole, supports the finding that there was no significant loss of household services.

### Conclusion

The motion of the Gravatts to amend the Opinion is granted in part and denied in part as set forth above. A revised opinion reflecting this disposition is filed herewith.

Submit judgment on notice.

It is so ordered.

### OPINION

Plaintiffs Steven Gravatt ("Gravatt"), a journeyman dock worker and his wife Delores Gravatt ("Mrs.Gravatt") (collectively the "Gravatts") have sought damages from defendants The City· of New York (the "City"), Simpson & Brown, Inc. ("S & B"), the employer of Gravatt, and N. Massand, P.C. ("Massand"), an engineering firm, arising out of an injury Gravatt received while working on the City's 145th Street Bridge (collectively, the "Defendants"). The City has cross-claimed against S & B and Massand and Massand has cross-claimed against S & B.

Upon the findings of fact and the conclusions of law set forth below, judgment will be entered in favor of Gravatt and Mrs. Gravatt against the City, Massand and S & B. Judgment will be entered in favor of the City on its cross-claim for indemnity against S & B and Massand. Massand's cross-claim against S & B will be dismissed.

### The Issue

A relatively simple accident has given rise to a complicated litigation in which five causes of action are alleged against three corporate defendants with a web of cross-claims asserted among the defen-

---

1. The portion of the Opinion at pages 424–425 containing the words "for the next twenty-two years" is inconsistent with the findings of fact on page 412 as to the permanency and must be stricken.

dants. Because of the uncertainties of the law and the conflicting views of insurance coverage, it has not been possible to accomplish a simple and just resolution by compromise and common sense. The complicated findings and conclusions set forth below result from the inability of insurers to agree on questions of coverage. It is that expensive offstage controversy which has driven this litigation, conducted by skilled and able lawyers for each of the parties.

Once again, the Court has been cast into "The Devil's Own Mess." [1] Indeed, to obtain a just result for the Gravatts it has become necessary to deal with some of the most exasperating issues in tort law, complicated by difficult legislation and precedent as will be apparent from what follows.

### Prior Proceedings

This action was commenced on January 16, 1997 by a complaint which set forth five causes of action: (1) liability of the City and Massand under the Labor Law of New York and federal law; (2) common law negligence against S & B and Massand; (3) a seaman's maritime claim based upon an unseaworthy vessel against S & B; (4) a claim against S & B as owner of the barges for negligence, defective maintenance and improper working conditions; and (5) loss of consortium by Mrs. Gravatt. Answers were filed and pretrial proceedings and discovery were had.

An opinion of April 6, 1998 (the "April 6 Opinion") resolved summary judgment motions holding that the Gravatts were entitled to judgment against the City and Massand under New York Labor Law §§ 200, 240(1), and 241(6) with the issue of contributory negligence under §§ 200 and 241(6) reserved for trial, and that the Gravatts stated claims under Section 905(b) of the Longshore and Harbor Worker's Compensation Act, 33 U.S.C.A. §§ 901–950 ("LHWCA"), and the Jones Act, 46 U.S.C.A. § 688, that the City is entitled to

indemnity from Massand and S & B, that Massand is not entitled to indemnity from S & B with Massand's contribution claim against S & B reserved for trial. *See Gravatt v. The City of New York,* 1998 WL 171491 (S.D.N.Y. April 10, 1998).

Thereafter, all of the defendants moved for reargument and two of them (the City and S & B) also sought an order certifying the Opinion for an interlocutory appeal pursuant to 28 U.S.C.A. § 1292(b). The opinion of June 24, 1998 denied the motion for certification, denied Massand's motion for indemnity against S & B, dismissed S & B's claims for indemnity and contribution against Massand, denied the City's motion to reconsider the application of the Labor Law to the action, granted S & B's motion to dismiss the plaintiffs' Jones Act claim, and amended the identity of the insurance company providing certain coverage to Massand. *See* 1998 WL 341941 (S.D.N.Y. June 26, 1998).

Massand then made a second motion to reargue the Court's decision regarding Massand's contribution claims against S & B. The opinion of August 19, 1998 dismissed Massand's second motion to reargue as moot, noting that Massand's indemnity claim against S & B had been dismissed, not its contribution claim. *See* 17 F.Supp.2d 247 (S.D.N.Y.1998).

Prior to trial, the parties consented to a bench trial which commenced on November 30, 1998, and continued through December 4, 1998. The Gravatts called seventeen witnesses. S & B called two expert witnesses and the City called no witnesses. Final argument and submissions were completed on February 3, 1999.

On March 3, 1999, an opinion was filed containing findings of fact and conclusions of law based upon the bench trial (the "Opinion"). The Gravatts then moved under Rule 52(b) to amend the Opinion, which motion was granted by a companion

---

**1.** *See* D. Currie, Federalism and the Admiralty: "The Devil's own Mess," 1960 S.Ct.Rev. 158 (1960).

opinion filed this date, setting forth the basis for the revisions contained in this revised opinion.

### Findings of Fact

### The Parties

Gravatt is a New Jersey resident and a journeyman dock builder and harbor worker who has worked for S & B since 1993. Gravatt has been married to Mrs. Gravatt for over seventeen years. Gravatt suffered severe, permanently disabling injuries while working at the 145th Street Bridge in Manhattan on January 31, 1996. He was 37 years old at the time of the accident.

The City of New York is a municipal corporation which maintains the New York City Department of Transportation in which there is a division formerly known as the Bureau of Bridges, now known as the Division of Bridges.

S & B is a New Jersey construction company.

Massand is a New York engineering firm.

### The Project

In late 1992, the Bridge Component Rehabilitation Section began a project in Manhattan to replace the fender systems on the Third Avenue and 145th Street Bridges which span the Harlem River (the "Project").

The fender system is a structure that looks like a pier which is attached to and surrounds the stone and mortar center stanchion of the bridge and consists of heavy pilings and timbers, and smaller, horizontal and diagonal pieces of lumber known as walers and braces for the purpose of protecting the bridge from collisions with ships traveling in the river. Its construction required the demolition and removal of the old, existing fender and some excavation of the river bottom.

The two bridges which were the subject of the Project are owned by the City and the Project was funded entirely by the City without state or federal financial aid. It was completed in 1996.

The City hired two contractors to perform the Project: a consulting engineer, Massand, to provide engineering, design, and other services; and S & B to do the construction. The City entered into a written contract with each defendant contractor. The contracts were awarded by competitive bidding, and Massand and S & B were the low bidders on their respective contracts.[1]

### The Contracts

Compliance with state and federal safety statutes was a standard practice of City construction projects. The contracts with Massand and S & B contained numerous safety provisions.

The contract between the City and S & B was entered into on May 7, 1992. It contained the following provisions:

*Labor Law Requirements.* The successful bidder [Simpson & Brown] will be required to comply strictly with all Federal, State and local labor laws and regulations, including but not limited to providing on-the-job training opportunities and payment of prevailing wages.

Article 5. *Compliance with Laws.* The Contractor must comply with all local, state and federal laws, rules and regulations applicable to this contact and to the work to be done hereunder, including, but not limited to, the Federal Occupational Safety and Health Act of 1970 ["OSHA"] the Construction Safety Act of 1969, as amended, and the following . . . .

Article 30. *The Resident Engineer.* The Resident Engineer shall be the representative of the Engineer at the site, and, subject to review by the Engineer, shall have the power, in the first instance, to inspect, supervise and control the performance of the work. . . .

Article 36. *Labor Law Requirements.* The Contractor must strictly comply with all applicable provisions of the New York State Labor Law, as it may be

amended and supplemented thereto, and the provisions of Section 343–9.0 of the New York City Administrative Code, as amended....

Article 36(b). That no part of the work, labor or services shall be performed or rendered by the Contractor in any plants, factories, buildings or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract. Compliance with the safety, sanitary and factory laws of the State in which the work is to be performed shall be prima facie evidence of compliance with this subsection.

That for any breach or violation of any of the paragraphs on working conditions and minimum wages above, the party responsible therefor shall be liable to The City for liquidated damages ... in addition, the Commissioner shall have the right to cancel the contract for any violation of this section and enter into other public letting, charging any additional cost to the original Contractor....

Any breach or violation of any of the foregoing shall be deemed a breach or violation of a material provision of this contract, and ground for cancellation thereof by the City.

Paragraph 1.06.22. *Contractor's Plant.* The Engineer shall have the right to reject or condemn any plant, apparatus, staging or other appliance which, in his opinion, is unsafe, improper or inadequate. Whether or not the Engineer exercises this right, the Contractor shall not be relieved from his sole responsibility for the safe, proper and lawful construction, maintenance and use of such plan, apparatus, staging or other appliance or for the adequacy of such plant....

Paragraph 1.06.23. *Rules, Laws, and Requirements.* (A) The Contractor shall, at his own cost, obtain all necessary permits, give all necessary notices, pay all legal fees and comply with all Federal, State and City Building and Sanitary Laws, ordinances and regulations applicable to this contract and to the work to be done hereunder....

*Superintendence.* Prior to commencement of the contract, the Contractor shall designate, in writing, Superintendents responsible for the contract work. A Superintendent must be on each job site continuously and will not be changeable [chargeable] to this contract and shall be considered as overhead....

The contract between the City and Massand was entered into on August 26, 1992, and contained the following safety provisions.

(a) Paragraph 5. The Engineer [Massand] shall ascertain the standard practices of the City prior to the execution of any of the work required by this Agreement. All work under this agreement shall be performed in accordance with these standard practices and the provisions of the contract documents. The contract documents shall be deemed to include this agreement, with accompanying schedule or schedules, if any, the construction contracts, and any supplements thereto, the standard Bureau of Highway Operations specifications, the plans of the project, any addenda to the plans, and project, and all the provisions required by law to be inserted in the Agreement and made a part hereof.

(b) Paragraph 6. The Engineer shall, upon written notice to commence work, take full charge of the Engineering Inspection of the project. The Engineer shall thereafter initiate all necessary orders to the Contractor(s), personally give field orders when necessary....

(c) Section III. *Resident Engineering Inspection Services to be Performed.* (A) The Engineer shall provide continuous resident engineering inspection services, testing of materials ser-

vices, design services, and shop drawing review services with a staff commensurate with the level of construction activity until completion and final acceptance of the Construction Contract work....

(d) Section I. *General Requirements.* (B) The Engineer specifically agrees that: (a) his subcontractors, agents or employees shall possess the experience, knowledge, and character necessary to qualify them individually for the particular duties they perform; (b) he will comply with the provisions of the Labor Law and all State Laws and Federal and local statutes, ordinances and regulations that are applicable to the performance of the Agreement....

(e) Section II. *Resident Engineering Inspection—General.* (A) The Engineer shall be the representative of the Department at the sites and, subject to review by the Commissioner or his duly authorized representative, shall have the power, in the first instance, to inspect the performance of the work....

(f) Section II. *Resident Engineering Inspection—General.* (B) The Engineer agrees that he will endeavor to safeguard the City against deficits and deficiencies in the work and that he will use reasonable care and reasonable powers of observation and detection in determining that the work conforms to the Construction Contract documents.

(g) Section II. *Resident Engineering Inspection—General.* (C) It is the responsibility of the Construction Contractor(s), and not the responsibility of the Engineer, to determine the "Means and Methods of Construction", as defined in Article 2, Paragraph 17 of the Agreement section of the Standard Specifications of the Bureau of Highway Operations, dated June, 1986, as currently amended. However, if the Engineer reasonably believes that the means and methods of construction proposed by the Construction Contractor(s) will constitute or create a hazard to the work, or to the persons or property, or will not produce finished work in accordance with the terms of the Construction Contract, such means and methods must be reported to the Commissioner, or to his duly authorized representative.

(h) Section III. *Resident Engineering Inspection Services to be Performed.* (A) The Engineer shall provide ... basic resident engineering inspection services for all items of work under the Construction Contract.... These services are to include monitoring of the Construction Contractor's activities for conformance with the contract documents, coordination with City Agencies and public and private utilities, and monitoring the condition of the contract site for conformance with the contract documents, so as to provide a safe environment for both workers and the general public....

(i) Section IV. *Fees and Payments.* (G) If the Construction Contractor performs the work in such a manner, or at such a number of simultaneous locations, as to require the Engineer, under the direction of the Commissioner, to provide additional inspectors such that the total inspection manpower, in person-days, shown on Table, will be exceeded, then this condition will be considered a change in the scope of this contract and a change order will be issued, subject to the approval of the Director of the Office of Management and Budget, increasing the maximum fee....

(j) Appendix A. 4.8 *Compliance with Law.* Contractor shall render all services under this Agreement in accordance with applicable provisions of federal, state and local laws, rules and regulations as are in effect at the time such services are rendered.

The City and Massand contract provides that Massand's duties "specifically do not include the choice of construction labor, materials, temporary structures, tools, plants and construction equipment, or the method and time of their use." Massand Agreement, Paragraph 2 at 1.

The Massand contract further provides that "it is the responsibility of [S & B], and not the responsibility of the engineer, to determine the 'Means and Methods of Construction', as defined in [the S & B Contract]." Massand Agreement, Section II(C) at SR–3.

Under the contract between the City and S & B, S & B was responsible for the "means and methods of construction," defined in the S & B contract as "the labor, materials in temporary structures, tools, plant and construction equipment, and the manner and time of their use, necessary to accomplish the result intended by this contract". Agreement, Art. 2.18, at 31.

The contract between the City and S & B also provided that "the means and methods of construction shall be such as [S & B] may choose; subject, however, to the engineer's right to reject means and methods proposed by the contractor which will constitute or create a hazard to the work, or to persons or property . . ." Agreement, Art. 4, at 32, and that "[t]he engineer's approval of [S & B's] means and methods of construction, or his failure to exercise his right to reject such means or methods, shall not relieve [S & B] of his obligation to accomplish the result intended by the contract . . ." Agreement, Art. 4, at 31, and that "[d]uring performance and up to the date of final acceptance, [S. & B] must take all reasonable precautions to protect the persons and property of others from damage, loss, injury or death resulting from his or his sub-contractor's operations under this contract, except such property as the owners thereof may themselves be under legal duty to protect." Agreement, Art. 7, at 34. The City and S & B's contract later confirms S & B's safety duties under article 7 of the S & b con-tract, by providing that "[t]he Contractor shall protect the work, persons and property in accordance with the provisions of article 7 of the Agreement . . ." Agreement, General Provisions, Section 1.06.28 at 110.

The City and S & B contract further provides that the "Engineer shall have the right to reject or condemn any plant, apparatus, staging or other appliance which, in his opinion, is unsafe, improper or inadequate. Whether or not the engineer exercises this right, [S & B] shall not be relieved from his sole responsibility for the safe, proper and lawful construction, maintenance and use of such plant, apparatus, staging or other appliance or for the adequacy of such plant." Agreement, General Provisions, Section 1.06.22 at 104. The Massand Contract further provides that Massand "shall be the representative of [the City] at the sites and, subject to review by [the City] or [its] duly authorized representative, shall have the power, in the first instance, to inspect the performance of the work, as delineated in article 30 [of the S & B Contract]". Massand Agreement, Section II(A) at SR–3.

S & B was required to follow orders given by the City or Massand. The resident engineer, who was employed by Massand, worked from an office near the Third Avenue Bridge and was in charge of field activities. The inspectors answered to the resident engineer. The resident engineer was a licensed engineer, but the inspectors, like S & B's supervisory personnel, were not licensed engineers and had no training in construction site safety.

The Massand inspectors were required to be at the job site whenever S & B was working. The contract required Massand to provide "continuous" services with a "staff commensurate with the level of construction activity." Massand Agreement, Section I(A) at SR–1.

The Massand contract obligated Massand to "provide a safe environment for both workers and the general public," and

the S & B contract, which was incorporated into Massand's, stated that Massand had the "power ... to inspect, supervise and control the performance of the work." Massand Agreement, Section III(A) at SR–5; Section II(A) at SR–3. The two Massand inspectors who worked at the 145th Street Bridge confirmed that their duties included the supervision of worker safety at the job site. They prepared written inspection reports daily in the course of their employment at the 145th Street Bridge. Many of the daily inspection reports contained notes of safety instructions and recommendations given by the inspectors to S & B relative to conditions on the site.

The City retained the right under the contracts to compel compliance with safety regulations and its Project Engineer had the authority to, and would, direct that safety problems be cured. On at least one occasion, the City and Massand stopped work at the site and would not allow S & B to resume work until safety violations were cured, as demonstrated in the following entry in Massand's daily work log:

> Contractor was instructed to clean & clear all walk-ways & access to the barge & also to correct the position of the ladder & remove all debris & other construction material so as to give clear & hazard-free access while moving within & around the working area. Contractor was given permission to start working after compliance of the above instructions.

In general, the City allowed Massand to have a single inspector at the project at any given time, the exception being when there was considerable construction activity, which was not the case on the day of Gravatt's accident.

The City required both S & B and Massand to comply with the New York State Labor Law, New York Industrial Code, and OSHA, but made no effort to determine whether these companies knew anything about the state and federal regulations regarding construction site safety.

No one assigned to this project by Massand or S & B had any knowledge of, or experience or training in, the safety statutes incorporated in the City's contracts.

Massand, however, represented to the City in its contract that its employees "possessed the experience, knowledge, and character necessary for the particular duties they perform." Massand Agreement, Section I(B) at SR–2.

Massand's contract required Massand to "[monitor] the condition of the contract site ... so as to provide a safe environment for both workers and the general public." Massand Agreement, Section III(A) at SR–5. Massand has contended that the thirty-two examples that follow this provision of the contract concerned activities that were not involved in the accident at issue and therefore indicate that Massand had no duty to supervise the condition of the barges or the use of timber tongs. However, the examples are introduced by the contract language that "may include, but shall not be limited to the following," and do not alter the contract clause that places on Massand the duty to provide the workers with a safe place to work. In addition, Massand was authorized to "reject means and methods ... which ... will constitute or create a hazard ... to persons or property." Massand Agreement, Section II(C) at SR–3.

Massand's contract with the City incorporated the City's contract with S & B. *See* Massand Agreement, Paragraph 5 at 2. When read together with S & B's contract, Massand had the duty to stop unsafe means and methods of construction.

In the section of the contract that describes the "Powers of the Resident Engineer, the Engineer, and the Commissioner," the resident engineer and the engineer, both of whom are Massand employees, are given broad powers:

> Article 30. *The Resident Engineer.* The Resident Engineer shall be the representative of the engineer at the site, and, subject to review by the engineer,

shall have the power, in the first instance, to inspect, supervise and control the performance of the work . . .

Article 31. *The Engineer.* The Engineer, in addition to those matters elsewhere herein delegated to the Engineer and expressly made subject to his determination, direction or approval, shall have the power, subject to review by the Commissioner:

(1) to determine the amount, kind, quality, and location of the work to be paid for hereunder;

(2) to determine all questions in relation to the work, to interpret the Contract Drawings, Specifications, and Addenda, and to resolve all patent inconsistencies or ambiguities therein;

(3) to determine how the work of this contract shall be coordinated with work of other contractors engaged simultaneously on this project, including the power to suspend any part of the work, but not the whole thereof . . .

\* \* \* \* \* \*

The foregoing enumeration shall not imply any limitation upon the power of the Engineer, for it is the intent of this contract that all of the work shall generally be subject to the determination, direction and approval, except where the determination, direction or approval of someone other than the Engineer is expressly called for herein.

\* \* \* \* \* \*

Article 4. *Means and Methods of Construction.* Unless otherwise expressly provided in the Contract Drawings, specifications and Addenda, the means and methods of construction shall be such as the Contractor may choose; subject, however, to the Engineer's right to reject means and methods proposed by the Contractor which: a. will constitute or create a hazard to the work, or to persons or property. . . .

The description of the resident engineer's powers gave Massand the "power . . . to . . . supervise and control . . . the

work," and, as engineer, to "suspend any part of the work" and reject means and methods of construction that "create a hazard . . . to persons or property." Agreement, Art. 4 at 32. The powers given to Massand are broad because it is the "intent of this contract" that "all of the work . . . be subject" to Massand's direction. In addition to the power to reject hazardous means and methods of construction, the contract provided the engineer with other sweeping powers and responsibilities:

Paragraph 1.06.22. *Contractor's Plant.* The Contractor may occupy with his construction plant any unused location within the area controlled by the Department, subject to the approval of the Engineer. If the Contractor desires to use additional area outside of that controlled by the Department, he shall arrange for such area at his own expense. The location of the Contractor's stationary and mobile equipment shall be subject to the Engineer's approval . . .

The Engineer shall have the right to reject or condemn any plant, apparatus, staging or other appliance which, in his opinion, is unsafe, improper or inadequate. Whether or not the Engineer exercises this right, the Contractors shall not be relieved from his sole responsibility for the safe, proper and lawful construction, maintenance and use of such plant, apparatus, staging or other appliance or for the adequacy of such plant.

All materials shall be properly stacked in convenient places adjacent to the site, or where directed, and protected in a satisfactory manner. All stacking of materials on streets shall be done in compliance with local laws and ordinances. If it should become necessary to remove and restack materials to avoid impeding the progress of any part of the work, or for any other reason deemed sufficient by the Engineer, the Contractor shall remove and restack such materials, as directed, at his own expense.

\* \* \* \* \* \*

Paragraph J. *Scaffolding and Ladders.* The Contractor shall furnish and securely set scaffolding, platforms and ladders required for the erection and inspection of his work. All such facilities shall be of good, sound materials, adequately dimensioned, substantially braced and tied, and shall be approved by the Engineer.

The contract placed Massand in control of the job site, especially over safety matters. The City made safety a material term of the agreement and gave Massand all powers necessary to enforce safety standards.

Article 36. *Labor Law Requirements.* 3(b). [N]o part of the work, labor or services shall be performed or rendered by the Contractor in any plants, factories, buildings or surroundings or under working conditions which are unsanitary or hazardous or dangerous to the health and safety of employees engaged in the performance of the contract.

3(c). Any breach or violation of any of the foregoing shall be deemed a breach or violation of a material provision of this contract, and ground for cancellation thereof by the City.

Massand has suggested that the term "Engineer" in S & B's contract refers to the City, while that same word in Massand's contract refers to Massand. However, the definition section of S & B's contract provides:

13. "Engineer" shall means the person so designated in writing by the Commissioner to act as such in relation to this contract, including a private engineer as the case may be.

The Commissioner (defined as the Commissioner of the Department of Transportation or his representative) designated

Massand as the "Engineer" in writing when the City signed Massand's contract (after signing S & B's).

THIS AGREEMENT ... by and between the City of New York, hereinafter called "The City," acting by and through the Commissioner of Transportation of the City of New York, hereinafter called "The Commissioner," and Nanik Massand, P.E .... herein called "The Engineer" ...

Massand is the "Engineer" in both contracts. This is confirmed by another definition in S & B's contract.

21. "Resident Engineer" shall means the representative of the Engineer duly designated by him in writing to be his representative at the site of the work.

Like its contract with Massand, the City's contract with S & B required S & B to comply with federal, state, and local safety codes. S & B, like Massand, did not know these laws and did not attempt to become familiar with them.

### The Performance of the Contracts

Under the contracts as set forth above, S & B was solely responsible for the means and methods of the performing the work on the Project.[2] Massand prepared the plans for the construction of the fender system for both the Third Avenue and 145th Street bridges. In addition to engineering and design services, Massand also performed non-engineering services, including daily on-site inspection of construction activities and safety supervision.

Massand hired a resident engineer to supervise the contract and also hired inspectors to work at each job site to supervise and to make sure that the construction work was performed according to the plans and performed safely.

---

2. Section II, entitled Resident Engineering Inspection—General, provides in relevant part:

C. It is the responsibility of [S & B] and not the responsibility of the engineer, to determine the "Means and Methods of Construction" .... However, if the Engineer

reasonably believes that the means and methods of construction by the Construction Contractor(s) will constitute or create a hazard to the work, or to the persons or property ... such means and methods must be reported to the Commissioner or to his duly authorized representative.

In order to perform its contract and complete the Project, S & B removed the old fender from around the center stanchion of each bridge, excavated the river bottom as needed, and installed the new fender system on each bridge. S & B's contract with the City was on a time and material basis. To accomplish the fender replacement S & B used at least three barges: a crane barge and two material barges. Sometimes S & B had a fourth barge at the job site. The number of barges employed at the job site was S & B's decision.

The crane barge provided working space for the crane, gear, and tools that were needed to pull out the old pilings and timbers, install the new pilings and timbers, and excavate as needed. It provided space for materials and a shanty in which Massand inspectors and engineers occupied a desk. The crane also loaded and unloaded the material barges.

S & B rotated barges using one barge to carry old material away from the job site (the debris barge) and another to carry new material to the job site (the material barge). S & B on occasion placed debris on the material barge before it was emptied of new material. Although S & B usually kept the new material and debris on separate barges, it was standard procedure to dump debris on top of and around new material on the material barge. The old pilings constituted much of the debris. The material and debris barges traveled to and from Port Newark, New Jersey, on a regular basis and were moved from location to location at the job site. The crane barge and the material barges were necessary and integral to the Project. When removing stone from the river, S & B dedicated a barge to the sole purpose of removing debris. No evidence was presented that would have precluded S & B from doing the same with respect to the debris resulting from the demolition of the old fender system.

The proper way to move pilings to and from the barges is to use timber tongs which resemble outsized ice tongs which are attached to a chain hung from the headache ball of the crane to lift the pile up a foot or so, lower it onto a "sleeper," remove the tongs, wrap a chain, choker, or sling around the pile, and then raise the pile with the crane. A sleeper is a block, usually a piece of wood, used as a wedge or spacer to elevate a load slightly for the purpose of creating room beneath the load to allow a sling or choker to pass under it.

S & B had a Safety Director, Eugene Reardon ("Reardon"), who reported to the company's safety committee and drafted S & B's safety handbook and safety manual and organized the weekly distribution of safety memos to the workers at the job site. Reardon had no training in construction site safety.

Robert Branston ("Branston") was the S & B project superintendent for the fender system repair, and the senior-most S & B employee at the job site in charge of safety. He had no training in construction site safety.

Gerhard Holzheuer ("Holzheuer") was the S & B foreman for the Project and Gravatt's immediate superior. He also lacked training in the New York Labor Law, New York Industrial Code, and OSHA. His safety training was limited to the information contained in weekly safety memos that were sent to him by Reardon to be read to the workers every payday.

Reardon, Branston, and Holzheuer had never seen the contract with the City and did not know what safety codes applied to the job. Branston testified that he "went through" the contract, but he also testified that he had no training in construction site safety, including the New York Labor Law, New York Industrial Code, and OSHA. Branston did not attend the weekly safety meetings, although required to do so, and did not read S & B's safety handbook until sometime after Gravatt's injury. S & B never asked Reardon to review the contract from a safety director's point of view.

The City knew or should have known that its contractors were not familiar with the safety provisions of the contract. The Project Engineer for the Bridge Component Rehabilitation Section of the Department of the Transportation of the City, Jose Cubelo ("Cubelo"), advised S & B and Massand that S & B was working in an unsafe manner, and also advised Henry Smith, Acting Director of the Bridge Component Rehabilitation Section ("Smith"). The City took no action to enforce the S & B or Massand contracts.

The City had no safety program in place and made no effort to ensure that safety was observed at the job site.

Cubelo told Branston of S & B and Forde Coppin, the resident engineer of Massand ("Coppin"), that the working conditions at the job site probably violated OSHA. Branston's response was that, if the City wants the job done, this is how they do it. Other than reporting to Smith, Cubelo did nothing when given this response.

The City was advised on September 7 and September 9, 1994, that too many men were getting hurt on the job. S & B's safety committee also believed that the 145th Street Bridge was the site of numerous personnel accidents.

On August 12, 1994, a worker was hurt on the job. At a progress meeting held on September 7, 1994, Coppin advised all in attendance, which included management personnel from all three defendants, *i.e.*, Massand's project engineer Ayman Baki ("Baki"), the head of the City's Bridge Rehabilitation program John Hendrickson ("Hendrickson"), and S & B's superintendent Branston, that too many men were getting hurt on the job.

Nine days after the September 7th progress meeting, another worker, Gunnar Berg, fell on the fender system. Work procedures were not altered, and no safety practices were implemented at the job site.

On January 31, 1996, the day of Gravatt's accident, Jodh Singh, the Massand inspector who was on duty at the job site ("Singh") left at lunch time without obtaining a replacement. He did not return until about 3:00 p.m. There were twelve S & B workers at the Project.

### The Accident

Shortly after lunch on January 31, 1996, foreman Holzheuer instructed Gravatt and his co-worker, Thomas Liming ("Liming"), to go onto a barge where S & B had mixed new material and demolition debris, to move several old piles that were obstructing access to two drafts of new lumber still on the barge. The drafts of lumber were the only new material remaining on the barge. Four lifts of new material had been completed previously that day. The rest of the barge was full of debris, and it was towed away the following day. Gravatt's and Liming's normal job duties did not include moving material on barges. It was another employee's job at the site to move this kind of debris, a "deck man" named Richard Sada.

The old piles that were obstructing access to the new drafts of lumber had been dumped on top of or near the new material by S & B's crane operator and deck man but the decision to mix debris with new material was made by Holzheuer. The stowage of the old piles resembled a giant game of "pick up sticks." Holzheuer instructed Gravatt and Liming to use the timber tongs and swing the pile over.

Jack Bombace, the S & B crane operator ("Bombace"), was in the crane on the crane barge. The crane barge was secured to the fender, and the material/debris barge on which Liming and Gravatt were working was tied to the crane barge. Bombace could not see Gravatt who was in the pile of debris about 60 or 70 feet away from Bombace. Gravatt could not see Bombace and did not give any signals to the crane operator. Gravatt climbed on the debris and reached to attach the timber tongs on a twelve foot piling at a location about one-third the length of the piling. Bombace received one signal which

he construed as a signal to swing the pile out of the debris heap, and Liming gave that signal. Bombace believed that Gravatt was on the other side of the draft of new lumber, and not in the debris heap. Liming did not use the hand signals specified in S & B's safety handbook. The signal that Liming would have used to direct Bombace to stop lifting was similar to the signal in the safety handbook for hoisting.

The pile was raised about ten feet in the air. As the pile was hoisted, the end of it became stuck in some of the debris on the barge. Gravatt was on the top of the draft of new lumber, about eight feet above the deck and turning away as the piling rose. Bombace was about to swing the pile away from the debris heap when the pile pulled through the tongs. Gravatt heard Liming yell "look out" and looked over his shoulder and saw the pile falling. The piling fell and hit another piling which bounded up and struck Gravatt in the back of the legs, knocking him from the top of the draft of lumber some 25 feet into the Harlem River.

The workers rescued Gravatt from the near freezing waters of the Harlem River, took him into the shanty, stripped him of his clothes, and placed him next to the heat.

Gravatt waited about half an hour for the ambulance to arrive. He complained of pain from his knees to his ankles. When the ambulance finally arrived, the medics refused to go down to the shanty to treat him. He was lifted in the crane bucket about 40 feet to the ambulance waiting on the bridge roadway. Gravatt was taken to Lincoln Hospital where he was advised that he suffered injuries to both his ankles and right knee.

### The Unsafe Practices

There is an industry-wide practice to use timber tongs only when the material to be lifted is picked up no more than 2 to 3 feet, enough to allow the worker to put a sleeper underneath the material and then re-hook the material using a cable sling or chain sling.

Although Massand's inspector, the City's project manager, and S & B's safety director, superintendent, and foreman all testified that it was unsafe to raise a pile with timber tongs, Bombace, the crane operator and a credible witness, said that this was a common practice at S & B's work sites. In his 30 years as a crane operator, Bombace has seen timber tongs used in the fashion employed here only at S & B job sites.

The manner in which the debris was loaded on top of and near the good material was in direct violation of S & B's own safety policy, as contained in its safety handbook and its safety memos. S & B's safety handbook, which Reardon wrote, required that stored materials be readily accessible. The handbook states that materials are to be properly stored so as to provide clear walkways for access to material.

S & B's safety handbook and safety memos required the company to observe good housekeeping practices at job sites. The mixing of debris and new material in a manner that obstructed access to the new material was a violation of good housekeeping. Reardon testified that the storage of new material on a debris barge would be a violation of good housekeeping.

The manner in which the debris piles were stowed on top of and near the good material created a foreseeable safety hazard. S & B's safety handbook and safety memos emphasize the connection between poor job site housekeeping and personal injuries. According to one memo, the "benefits [of good housekeeping] include accident reduction...." Another memo states that proper material storage reduces "material handling accidents." Proper material handling, states another memo, "is a controlling factor in survival for yourself and co-workers as well." The safety handbook sums it up as follows: "Good housekeeping is the basis for a safe work environment...."

Massand was contractually obligated to provide the workers with a safe work environment and, therefore, good housekeeping was one of Massand's duties. The testimony of Massand's inspectors and the daily records they maintained indicate that they frequently gave orders relating to good housekeeping at the 145th Street Bridge job site with respect to the condition of walkways in inclement weather.

S & B conducted weekly safety meetings at its job sites. These meetings were usually conducted during the employees' lunch hour on payday. S & B sent safety meeting memos to the job site with paychecks to be distributed by Holzheuer and they were ordinarily read to the men by the shop steward during lunch hour on payday. It was S & B's practice to have each employee in attendance at the meetings sign the safety memo to show that the employee was present when the memo was read aloud. The Massand inspector did not attend the safety meetings, and Massand did not require him to do so. Bombace, the crane operator on the job site, sometimes attended the safety meetings, but never signed the safety memos because S & B's superintendent, Branston, told him, with respect to the safety memos: "[Y]ou realize we can't work this way, it would slow things down too much. So nobody ever said anything, but I told him no, I refuse to sign it. You can't tell me to sign something saying I'm going to work one way and then tell me to work a different way. So I refused to sign it." (Bombace Tr.Trans. at 173).

The safety meeting memos supplied to the employees were provided to S & B by a subscription service. These memos were designed for the construction industry, but not for marine construction. None of the memos were ever altered or edited by anyone at S & B. The supervisory personnel, including Reardon and Holzheuer, never considered amending the memos. None of the memos discussed barges, working conditions on barges, or safety precautions relating to barges.

A safety memo about timber tongs was received only after Gravatt's injury. In the several hundred safety memos produced by S & B there was no prior reference whatsoever to the use of timber tongs. The safety meetings and memos failed to satisfy the safety requirements of the contracts between the City and S & B and Massand.

Matthew Quesada, a dock builder who worked for S & B, was the shop steward for most of the time he worked for S & B and complained about safety to S & B and Massand. He believed that S & B was an unsafe company. Quesada was laid off in late 1995.

Because S & B had operational control of the site and the means by which the work was performed, it is primarily liable for Gravatt's damages as between S & B and Massand. Massand's negligence was primarily supervisory.

### The Injuries

Gravatt was admitted to Lincoln Medical Center on January 31, 1996, at 3:15 p.m., about two hours after the accident. The records of Lincoln Medical Center indicate that Gravatt experienced pain to both lower extremities upon flexion and extension. The Trauma Sheet indicates that Gravatt was experiencing pain in both knees and both ankles.

According to x-rays taken by Lincoln Medical Center of Gravatt's right tibia, left tibia, and both ankles, Gravatt suffered fractures of his right leg below the knee and the right ankle. Lincoln Medical Center's records also indicate that Gravatt had tenderness in and about the left ankle with edema.

The relevant bones in the left ankle are the tibia, which is the large bone in the leg and the fibula, which is the small bone in the leg; the talus, which is the ankle bone at the top of the foot and the calcaneus, which is the heel bone. The fibula and the tibia form an arch around the talus called the "mortise." The fibula is on the outside (lateral) side of the ankle and where it

frames the talus is called the lateral malleolus. On the inner part of the ankle is the medial malleolus which is formed by the end of the tibial bone. The calcaneus is the heel and the connection between the calcaneus and the talus is called the subtalor joint.

The day after the accident, February 1, 1996, Gravatt saw Dr. Frederick DePaola, the orthopedist usually consulted by the Gravatt family. Gravatt was in a wheelchair, complaining of severe pain in the left ankle, and had limited motion in the left ankle due to swelling and pain.

On February 8, 1996, the Jersey Shore Medical Center conducted a bone scan which showed areas of increased uptake of technetium in the lateral tibial condyle of the right knee and in the left talus. Gravatt had possible fractures in and about the areas of increased uptake.

On February 20, 1996, Dr. Karmel, a radiologist, conducted a CT scan of Gravatt's right knee, which indicated a minimally displaced proximal fibula fracture that appeared to be focally comminuted and a CT scan of Gravatt's ankles, which indicated that there was a lucent line through the posterior lip of the distal tibia. In addition, there was soft tissue swelling present about the left distal tibia and a slight irregularity of the anterior margin of the distal tibia that may have been a small avulsion fracture.

On April 11, 1996, Gravatt returned to Dr. DePaola for the seventh time in two and a half months, still complaining of limited motion and swelling in the left ankle. Dr. DePaola recommended an MRI of the left ankle and talus.

On April 16, 1996, the New Jersey Diagnostic Imaging & Therapy performed an MRI of Gravatt's left ankle, which indicated a healing tear of the anterior talofibular ligament, an irregularity of the talar dome, and a possible tear of the posterior tibiotalar ligament.

On May 9, 1996, Dr. DePaola noted that Gravatt was doing well, except for the left ankle, and that he experienced diffused soreness and swelling in the left ankle when he tried to walk.

On May 22, 1996, Gravatt was sent to Dr. Christopher Johnson for a second opinion. Dr. Johnson found that: (1) the left ankle mortise was well-reduced; (2) there were irregularities involving both the medial and lateral malleoli; and (3) the talus was reduced. Dr. Johnson believed that, after a crush and/or soft tissue injury involving the ankle, more clinical improvement would have been expected. He believed that there were multiple etiologies to consider, including intra- and extra-articular sources within the joint and outside the joint, as the cause of the problems. Dr. Johnson's diagnosis included a fracture involving the left ankle, peroneal tendinitis, and arthrofibrosis.

On July 11, 1996, Dr. DePaola referred Gravatt to Dr. Walter Pedowitz, an ankle and foot specialist, because Dr. DePaola felt that Gravatt had a complicated foot problem.

Dr. Pedowitz began specializing in foot and ankle surgery after he concluded his residency in 1976. He is the Associate Editor of Foot and Ankle International (the official journal of the American Orthopaedic Foot and Ankle Society), an author of 11 articles on foot and ankle surgery and other topics relating to the foot and has been lecturing in the U.S. and abroad on foot and ankle surgery. He teaches foot and ankle surgery at the College of Physicians and Surgeons, Columbia University, The College of Medicine and Dentistry in New Jersey, and Seton Hall Medical School. Dr. Pedowitz is a subspecialist in foot and ankle surgery.

In July 1996, after evaluating Gravatt orthopedically and reviewing several diagnostic tests, Dr. Pedowitz concluded that he had a problem in the area of his foot called the sinus tarsi, the hollow or canal formed by the groove between the heel bone and ankle bone. Further, Dr. Pedowitz concluded that Gravatt had prob-

lems with a tendon on the inner side of his foot as well as having pain in the left ankle.

Dr. Pedowitz injected the area of the ankle and foot that was painful. The injection relieved the pain, indicating that there was some instability or inflammation in the subtalar joint, which is the joint between the talus and the calcaneus.

Dr. Pedowitz recommended a course of treatment after Gravatt's first visit: (1) if the ankle improved with the injections, the treatment would end there; (2) if the injections did not work, he would remove the inflamed tissue in the sinus tarsi area, and stabilize the lateral ankle; and last, (3) if the removal of tissue and stabilization did not work, he would fuse the subtalar joint and make that joint solid to prevent pain.

On August 30, 1996, Rahway Hospital Imaging took an x-ray of Gravatt's left foot which indicated degenerative changes at the subtalar joint, talonavicular joint, and ankle itself caused by traumatic injury.

On September 6, 1996, Dr. Pedowitz performed the first of three operations on Gravatt at Rahway Hospital: a sinus tarsi clean out with peroneal brevis tenodesis and posterior tibial tenolysis. Gravatt was placed in a cast for nine (9) weeks following the first operation.

On March 18, 1997, about six (6) months after the first operation, when it became clear that Gravatt was not getting the result Dr. Pedowitz had anticipated, Dr. Pedowitz performed the second operation, a subtalar arthrodesis, meaning a fusion of the talus, the ankle bone, and the calcaneus, the heel bone. At this time, a bone graft was taken from the upper portion of the tibia, or leg bone. Gravatt was in a non-weight bearing cast for 6 weeks following the second surgery, followed by a weight bearing cast for another 6 weeks. After the second operation, the subtalar pain was completely gone.

On July 23, 1997, four months after the fusion surgery, Gravatt started to com-plain of pain and discomfort in the posterior aspect of the left ankle.

Dr. Pedowitz felt that the pain was related to a loose bone in the back of the ankle called the os trigonum which Gravatt had had since birth and had become a secondary center of calcification in the talus.

On February 9, 1998, Dr. Pedowitz performed a third surgery on Gravatt to remove the os trigonum bone that became symptomatic as a result of the injuries suffered on January 31, 1996. Gravatt was again placed in a cast for nearly a month following the third surgery.

At that time, Dr. Kline, Dr. Pedowitz's partner, performed arthroscopic surgery on Gravatt's left knee to repair a torn medial meniscus, which was causally connected to the left ankle injury.

Since January 31, 1996, Mr. Gravatt's main complaint has been pain in and about the left ankle in the area called the syndesmosis, a group of tight ligaments that hold the tibia and fibula together.

Dr. Pedowitz has planned one or two more surgeries for Gravatt, which will include a tenolysis of the syndesmosis; and if that does not relieve Gravatt's pain, then a fusion of the fibula and tibia above the ankle joint may be required in order to clean out or fuse the ankle joint itself. Dr. Pedowitz expects to achieve his treatment and surgical goals after Gravatt's anticipated future operation.

The cost of the tenolysis of the syndesmosis will be about $12,000. The cost of the tibia and fibula fusion will be about $25,000. Any future operations will also require physical therapy afterwards, and additional cost.

Dr. Pedowitz' diagnosis of the problem in the sub-talor joint was that Gravatt had sub-talor arthritis/instability and because of the sub-talor arthritis, he fused the calcaneus to the talus. Some arthritis found in the sub-talor joint pre-existed the injury, as a result of a 20–year old left

ankle fracture at the lateral malleolus suffered by Gravatt while playing basketball.

Dr. Pedowitz concluded that Gravatt's injuries were caused by a crush injury to the foot resulting in an instability of the sub-talor joint, although there is nothing on the diagnostic films taken of Gravatt's left ankle that showed a crush injury. Since he had seen Gravatt well after the injury, he relied upon the facts of the accident as related to him to establish the effect of the injury.

On January 7, 1997, Dr. Stephen Allan examined Gravatt on behalf of the NYC Carpenter Benefit Fund. Dr. Allan's report indicates that: (1) the left hindfoot and ankle has marked loss of motion; (2) there is subtalar pain; and, (3) there is peroneal spasm. Dr. Allan suggested that a subtalar arthrodesis would be appropriate. The defendants did not call Dr. Allan to testify at trial.

On February 5, 1997, Dr. Alexander Fasulo examined Gravatt on behalf of Lamorte Burns & Co., Inc., S & B's agent. Dr. Fasulo's report indicates that Gravatt complained of "significant pain in the left ankle and foot, where gross restriction of range of motion is present, inability to walk without external support, nocturnal distress to the left ankle and foot, [and] continuous need for pain medication." Dr. Fasulo also wrote that the medical records he reviewed were "replete with extensive and intensive follow-up notes describing treatment by several physicians, completely corroborating Mr. Gravatt's subjective history." Dr. Fasulo noted that Gravatt used a cane and was limping severely, and that Gravatt's complaints were related to his left foot and ankle. Dr. Fasulo measured Mr. Gravatt's calves and noted that the circumference of the left calf measured one-half inch less than the right. Dr. Fasulo reviewed the x-rays and noted significant amounts of articular and periarticular hypertrophic degenerative changes about the left ankle, the subtalar and the talonavicular joints. Dr. Fasulo concluded that Gravatt was injured "quite severely at the time of the accident in question, including musculoskeletal and articular injuries." Dr. Fasulo further reported to S & B that Gravatt had reached maximum benefit from conservative treatments; that the left extremity sustained severe soft tissue injuries which became diagnosable only after the acute edema subsided, and that the accident caused articular cartilage and synovial degenerative changes. Lastly, Dr. Fasulo agreed with Dr. Pedowitz's recommendation for an additional surgical procedure to be performed on Gravatt's left ankle, stating, "I am in full agreement about the need of this final procedure to relieve mobility pain and stabilize the arthrotic ankle, sub-talar and Talo-navicular joints." Dr. Fasulo was not called by defendants.

On January 26, 1998, Dr. Henry Magliato examined Gravatt on behalf of S & B. Dr. Magliato reported that Gravatt had suffered a number of injuries as a result of the accident of January 31, 1996, the most severe of which focused on the left ankle, and that Gravatt was still impaired for all of the duties required of a dock builder because the occupation requires full use of both lower extremities.

The only medical testimony contrary to that of Dr. Pedowitz, with respect to the injury and causation, was that of Dr. Maurice Carter, an orthopedic surgeon called by S & B. Dr. Carter is not a foot and ankle specialist and lacks Dr. Pedowitz's credentials. His testimony denying a causal connection was unpersuasive.

The injuries and resulting operations will cause: (1) increased aging at a more rapid rate of the surface of the ankle joint and the joints in the foot; (2) arthritis; (3) post-traumatic degenerative changes; and, (4) problems with the knees, hips, and lower back.

Gravatt walks with a limp, which is permanent. The limp places stress on all the adjacent joints in the lower extremities on both sides, as well as the lower back. Gravatt will continue to experience pain at

rest, pain with use, and weather ache in the foot, the ankle, the knee, and low back on a permanent basis.

Gravatt's injuries to his right and left knees and ankles, all of the treatment he received to his ankles and knees since the day of the accident, and the future difficulties Dr. Pedowitz described as set forth above were directly and proximately caused by the accident.

### Economic Loss to Date

As a marine carpenter, Gravatt was a beneficiary of a collective bargaining agreement which, as of July 1, 1997, was paying $28.68 per hour. Although there is evidence of the rate of prior wages before 1997, there is no evidence of what the wages would have been in 1998. Since it has been three years from the date of injury, it can be inferred that July 1, 1997 being the midpoint of the three years, the rate in effect as of that date would average out the rates before that date and after that date. Accordingly, for purposes of calculating past lost wages, $28.68 per hour is an appropriate rate. Using that rate applied to 1431 hours per year, Gravatt's past wage loss amounts of $41,041.08 per year. He incurred approximately $7,302.52 per year in work expenses. He further incurred approximately $10,670.68 in taxes.

Under his collective bargaining agreement, Gravatt was also entitled to fringe benefits, including payments for welfare, pension annuity and vacation. He is now the beneficiary of Social Security benefits. His total fringe benefits were in the amount of $21.78 per hour as of July 1, 1997, which can be used as the average for the last three years of which $2.19 was Social Security contributions. Accordingly, the total annual gross loss in salary and fringe benefits was $69,346.26 per year (1,431 × $ 48.46). In addition, there are past medical expenses of $46,425.71 as yet unpaid.

Gravatt's life expectancy was 37.6 years from the date of the injury. His work life expectancy at the time of the accident was 22.49 years, which was reduced to 11.04 years after the accident. His annual salary plus fringe benefits is set forth above. Gravatt seeks to return to work. He did not graduate from high school and has a learning disability, and he has not sought to obtain a General Equivalency Diploma. In New Jersey, there are approximately 7,800 jobs that Gravatt now qualifies for with his disabilities. These jobs represent only ⅛ of 1% of all of the jobs available in New Jersey. Gravatt should be able to obtain a job earning a yearly salary (before taxes) of $20,000 with work expenses of $2,000.

■ A discount of 2% is appropriate. *See Doca v. Marina Mercante Nicaraguense S.A.*, 634 F.2d 30, 40 (2d Cir.1980); *Roselli v. Hellenic Lines Ltd.*, 524 F.Supp. 2, 4 (S.D.N.Y.1980). In the absence of credible contrary evidence, a district court may use a 2% rate as the discount rate in personal injury cases. *See McCrann v. United States Lines, Inc.*, 803 F.2d 771, 775 (2d Cir.1986).

In addition, Gravatt will incur the likely cost of future vocational expenses of $34,249, and future surgical expense of $37,000.

Although Gravatt seeks to recover the loss of household services, the proof has failed to establish that he cannot perform such services.

### Contributory Negligence

Although Gravatt knew and should have known that the work he was performing with the timber tongs was being done in a hazardous fashion, he was directed by Holzheuer to use the timber tongs and to perform the task in the manner which resulted in his injury.

### Pain and Suffering

On the day of the accident Gravatt experienced excruciating pain. All the dock builders who saw Gravatt after the accident testified that he was in great pain. Bombace said that Gravatt was "oblivious"

with pain. (Bombace Tr.Trans. at 183). In addition to the pain caused by having his ankles crushed by the falling pile, Gravatt experienced pain, anxiety, and the fear of drowning or freezing to death when he plunged into the Harlem River wearing his clothes and heavy tool belt with currents threatening to sweep him down river.

After the accident, he was confined to a wheel chair for 5–6 weeks and wore casts for 6–8 weeks. After the casts were removed, he walked on crutches or with a cane for about six (6) weeks and underwent painful physical therapy three (3) times a week for at least four (4) weeks.

In September 1996, Dr. Pedowitz operated on Gravatt's left foot. After the operation, he was experiencing searing pain. He wore a cast for about nine (9) weeks after the operation and then went to physical therapy again for another twelve (12) weeks. The operation did not resolve his problem and he continued to experience pain, and walked with crutches or a cane.

He went for a second operation in February 1997, and again experienced great pain after the operation. He was bedridden for a week, and he wore casts again for another twelve (12) to fifteen (15) weeks after the second operation, and went for physical therapy three (3) times a week after the cast was removed.

The second operation did not relieve his pain and he had a third operation in March 1998. Again, he experienced pain after the operation, wore casts for eight (8) weeks, and then underwent physical therapy for a month.

Dr. Pedowitz testified that Gravatt will need one, possibly two more operations.

Gravatt was an outdoorsman. He worked outdoors and spent much of his free time hunting and fishing. His hunting and fishing is now limited as a result of his limp and his difficulty walking. He shared his enthusiasm for outdoor recreation with his family, particularly his teenage son. He also played baseball and raced miniature sports cars with his son, and played soccer with his teenage daughter. These activities are no longer possible for him because of his disability. Gravatt's wife described him as a good husband and good father who has become short-tempered and impatient with his family, and even withdrawn, from his wife and children since the accident.

Gravatt's past pain and suffering would be fairly compensated by an award of $300,000. He will also endure pain and suffering in the future for the next twenty-five years for which he should be compensated in the amount of $200,000.

### Damages of Mrs. Gravatt

■ Mrs. Gravatt is entitled to recover damages for loss of consortium for the past as well as the future. Loss of consortium includes loss of services, love and affection, companionship, society, sexual relations, disposition and temperament in the social life and comfort and happiness of members of the family. *Millington v. Southeastern Elevator Co.*, 22 N.Y.2d 498, 293 N.Y.S.2d 305, 239 N.E.2d 897 (1968).

Immediately after the accident, Gravatt was in a wheel chair for approximate 5–6 weeks. During this time, Mrs. Gravatt had to care for her husband's personal needs. After the accident and during this treatment, his children also had to "wait on him." (D. Gravatt Tr.Trans. at 495). While Gravatt was confined to a wheel chair after the accident, Mrs. Gravatt was not able to sleep with her husband. Gravatt had to sleep on the first story of the house in his son's bed, while Mrs. Gravatt slept on the couch in their first floor living room, so that Gravatt could get her attention if he needed her help.

Mrs. Gravatt had a good relationship with her husband before the accident. They have been married for seventeen years. After the accident, when it became apparent that Gravatt would not be able to go back to dock building, he became withdrawn from his wife and children. Both

Gravatt and Mrs. Gravatt are seriously depressed.

Mrs. Gravatt began to drink heavily and sought counseling for depression. She suffers from the stress of acting as mediator between her children and husband, and working full time. She has been prescribed medication and has lost weight, and appetite, and has had difficulty sleeping since the accident.

Before the accident, Delores and Steven Gravatt enjoyed a good sexual relationship. Their intimate relationship has changed because of Gravatt's injuries and limitations, and the added pressures upon Mrs. Gravatt.

Mrs. Gravatt's relationship with her children has changed. She does not have the time she did before to sit with her children and give them affection. Mrs. Gravatt's personality has changed. She used to be fun and happy, tactful. Today, she is depressed and has lost the patience she once had.

The Gravatts have stopped seeing their friends, stopped attending family gatherings and summer outings. There have been no family vacations as there had been prior to Gravatt's injury.

Mrs. Gravatt's loss of consortium would be fairly compensated by an award of $200,000: $100,000 for her loss to date and $100,000 for the loss she can anticipate for the next fifteen years.

### CONCLUSIONS OF LAW

#### Jurisdiction

Subject matter jurisdiction over this action exists under 28 U.S.C. §§ 1333 and 1367. Although the April 6 Opinion dismissed the Gravatt's claim under the Jones Act, 46 U.S.C. § 688, maritime jurisdiction remains under the Gravatt's claims under general maritime law. In addition, discretionary jurisdiction, 28 U.S.C. § 1367, also exists on the basis of judicial economy and the familiarity with the proceedings over the more than two year period this case has been pending. *See Purgess v. Shar-*

*rock*, 33 F.3d 134 (2d Cir.1994); *ABF Capital Management v. Askin Capital Management, et al.*, 957 F.Supp. 1308 (S.D.N.Y. 1997).

### The Gravatts are Entitled to Recovery Against the City and Massand Under the Labor Law

■ For the reasons set forth in the April 6 Opinion, the New York State Labor Law is not preempted by federal maritime law, and the City and Massand are liable to Gravatt under §§ 200, 240, 241. The City's liability results from its status as the owner of the 145th Street Bridge site. Massand's negligence under the Labor Law is not professional malpractice, *i.e.*, negligence as an engineer, but rather, it is ordinary negligence arising out of its failure to supervise and control the performance of the work and the condition of the job site, and its failure to train its inspectors adequately in construction site safety.

New York Labor Law § 240(1) provides as follows:

All contractors and owners and their agents, except owners of one and two-family dwellings who contract for but do not direct or control the work, in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

No liability pursuant to this subdivision for the failure to provide protection to a person so employed shall be imposed on professional engineers ... who do not direct or control the work for activities other than planning and design.

■ Labor Law § 240 obligates the owners and contractors, and their agents, to make sure that the workers perform their jobs safely, at least when fall hazards

are involved. *See Sheridan v. Beaver Tower, Inc.,* 229 A.D.2d 302, 644 N.Y.S.2d 739 (1st Dep't 1996). The law is to be construed as liberally as possible to effectuate its purpose. *See Buckley v. Radovich,* 211 A.D.2d 652, 621 N.Y.S.2d 638 (2d Dep't 1995); *Gordon v. Eastern Ry. Supply, Inc.,* 82 N.Y.2d 555, 559, 606 N.Y.S.2d 127, 129, 626 N.E.2d 912, 914 (1993).

■ The City is liable to Gravatt under Section 240 of the Labor Law, known as the Scaffold Law, because it was the owner of a job site (the 145th Street Bridge) where construction was taking place, and Gravatt was, at the time of the accident, working at an elevated workplace—namely, the pile of debris and the draft of lumber which stood on the deck of the debris barge. *See Gordon,* 82 N.Y.2d 555, 606 N.Y.S.2d 127, 626 N.E.2d 912; *Rocovich v. Consolidated Edison Co.,* 78 N.Y.2d 509, 577 N.Y.S.2d 219, 583 N.E.2d 932 (1991). In addition to working at an elevated location, the use of a crane to hoist material over the heads of Gravatt and Liming makes § 240 of the New York Labor Law applicable because it exposed Gravatt to the type of gravity-related risk that § 240 was specifically designed to correct. *See Ross v. Curtis–Palmer Hydro–Electric Co.,* 81 N.Y.2d 494, 501, 601 N.Y.S.2d 49, 53, 618 N.E.2d 82, 86, (1993).

> Labor Law § 240(1)'s list of *required* safety devices ... evinces a clear legislative intent to provide "exceptional protection" for workers against the "special hazards" that arise when the work site is ... below the level where "materials or load [are] hoisted and secured" .... [T]he "special hazards" referred to are limited to such specific gravity-related accidents as ... *being struck by a falling object that was improperly hoisted or inadequately secured*....

*Ross,* 81 N.Y.2d at 501, 601 N.Y.S.2d at 52, 618 N.E.2d at 85–86 (emphasis added).

The Scaffold Law obligates "all contractors and owners and their agents" to "furnish or erect or cause to be furnished or erected ... scaffolding, hoists, ... *slings,* ... and other devices ... to give proper protection to a person so employed." (Emphasis added.) Here, there was a failure to provide Gravatt with the sling necessary to perform his assigned job safely. The failure to use a sling violated § 240, § 241(6), and § 200 of the New York Labor Law, violated an industry-wide standard of care, and was one of the causes of the accident.

The City and Massand are also liable to Gravatt under Section 200 of the Labor Law, which provides:

> All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places. All machinery, equipment, and devices in such places shall be so placed, operated, guarded, and lighted as to provide reasonable and adequate protection to all such persons. The board may make rules to carry into effect the provisions of this section.

As found above, the 145th Street Bridge was an unsafe work site and, based on the testimony of Cubelo, all of the defendants were on notice of this condition. In addition, S & B routinely mixed debris and new material on the same barge, an unnecessary and unsafe practice that created an unsafe condition that the City and Massand accepted. S & B also regularly used timber tongs in an unsafe manner and in this instance, timber tongs were used in an unsafe manner aboard a barge that was in an unsafe condition.

■ Section 200 of the Labor Law codifies the common law duty imposed on property owners, contractors, and their agents, to provide workers with a safe place to work. *See Rizzuto v. L.A. Wenger Contracting Co., Inc.,* 91 N.Y.2d 343, 352, 670 N.Y.S.2d 816, 821, 693 N.E.2d 1068, 1073 (1998); *Russin v. Louis N. Picciano & Son,* 54 N.Y.2d 311, 316–17, 445 N.Y.S.2d 127, 129, 429 N.E.2d 805, 807

(1981). This duty falls on those who supervise or control the work. "An implicit precondition to this duty to provide a safe place to work is that the party charged with that responsibility have the authority to control the activity bringing about the injury to enable it to avoid or correct an unsafe condition." *Russin*, 54 N.Y.2d at 317, 445 N.Y.S.2d at 129, 429 N.E.2d at 807.

In this case, the City and Massand supervised and controlled the work, including the mixing of debris and new material on the same barge, and the use of timber tongs to hoist material. Both the City and Massand knew or should have known of the unsafe practice of using timber tongs to hoist material, and the unsafe condition created by mixing debris with new material on the same barge. The City and Massand had the authority to alter these practices and conditions. The City's and Massand's failure to correct these unsafe practices and conditions caused or contributed to the accident that injured Gravatt. The City's and Massand's failure to train their employees in construction site safety, particularly the rules and regulations promulgated under the New York Labor Law and Industrial Code, also constituted a cause of the accident, as was their failure to take corrective action once they were put on notice of S & B's unsafe, hazardous, and dangerous manner of working.

The City and Massand are also liable under Section 241(6) of the Labor Law, which provides:

All contractors and owners and their agents, except owners of one and two-family dwellings who contract for but do not direct or control the work, when constructing or demolishing buildings or doing any excavating in connection therewith, shall comply with the following requirements:

\* \* \* \* \* \*

6. All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places. The board may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work, except owners of one and two-family dwellings who contract for but do not direct or control the work, shall comply therewith.

Section 241(6) is similar to both § 240 and § 200. Like § 200, § 241(6) reiterates the common law duty to provide a safe place to work. Also like § 200, § 241(6) does not contain specific safety measures. The specific safety measures that must be observed are enacted by the New York State Commissioner of the Department of Labor and are contained in the New York State Industrial Code (the "Industrial Code") found in the Codes, Rules and Regulations of the State of New York, volume 12. (12 Labor NYCRR.); *see also Ross*, 81 N.Y.2d at 501, 601 N.Y.S.2d at 53, 618 N.E.2d at 86.

The use of timber tongs, instead of a sling, violated an industry-wide safety standard. It also violated § 1981.81 of OSHA, 29 CFR § 1981.81, as well as Industrial Code §§ 23–1.5(c)(2), 23–2.1, 23–3.3(k), 23–6.1(d), 23–6.1(e), 23–8.1(e)(3), 23–8.1(f)(1)(iv), 23–8.1(f)(2)(ii), and 23–8.2(c)(3). The manner and practice of loading debris on top of, and near, the good material were in direct violation of S & B's own safety policy. It also violated § 1918.91 of OSHA, 29 CFR § 1918.91, and §§ 23–2.1(a)(1), 23–2.1(b), 23–3.3(k)(1)(ii) of the Industrial Code.

Industrial Code § 23 incorporates the broad fall prevention goal of § 240(1):

§ 23–1.2 *Finding of fact.*

The board finds that the trades and occupations of persons employed in construction, demolition and excavation operations involve such elements of danger

**418**

to the lives, health and safety of such person and of persons lawfully frequenting the areas of such activities as to require special regulations for their protection in that such persons are exposed to the following:

(a) The hazards of falling and of falling objects and material. . . .

(e) The hazards incidental to the handling and movement of heavy materials. . . .

The following Industrial Code regulations were violated:

§ 23–2.1 *Maintenance and housekeeping.*

(a) Storage of material or equipment. (1) All building materials shall be stored in a safe and orderly manner. Material piles shall be stable under all conditions and so located that they do not obstruct any passageway, walkway, stairway or other thoroughfare. . . .

(b) Disposal of debris. Debris shall be handled and disposed of by methods that will not endanger any person employed in the area of such disposal or any person lawfully frequenting such area.

The new material that Gravatt and Liming were attempting to free was not stored in a safe and orderly manner, and the debris that was dumped haphazardly on or around the new material endangered the workers.

§ 23–3.3(k) *Storage of materials.*

(1) General. . . .

(ii) Storage areas shall not interfere with access to any stairway or passageway used by any person as a means of ingress or egress. Suitable barricades shall be provided to prevent stored materials from sliding or rebounding into any areas where any person is located or passing. All materials shall be safely piled in such locations as will not interfere with any work operations nor present any hazard to any person employed at or frequenting the demolition site.

By mixing debris and new material, S & B, the City's contractor, interfered with the work operations in a way that required workers to move around and climb on unstable piles of debris to gain access to the new material needed to work. This type of unnecessary hazardous storage was, unfortunately, routine at the 145th Street Bridge job site.

§ 23–6.1 *General requirements.*

\*　　\*　　\*　　\*　　\*　　\*

(d) Loading. Material hoisting equipment shall not be loaded in excess of the live load for which it was designed as specified by the manufacturer. Where there is any hazard to persons, all loads shall be properly trimmed to prevent dislodgment of any portions of such loads during transit. Suspended loads shall be securely slung and properly balanced before they are set in motion.

This provision of the Industrial Code was violated because equipment used for hoisting the timber tongs were not designed to perform that task, was inadequate for the load it was meant to carry, the load was not trimmed and balanced to prevent dislodgment and a proper sling was not used.

§ 23–8.1 *General provisions.*

(e) Load handling. . . .

(3) Where slings are used to hoist material of long length, spreader bars shall be used to space and keep the sling legs in proper balance. . . .

(f) Hoisting the load. (1) Before starting to hoist with a mobile crane, tower crane or derrick the following inspection for unsafe conditions shall be made. . . .

(iv) the load is well secured and properly balanced in the sling or lifting device before it is lifted more than a few inches.

(2) During the hoisting operation the following conditions shall be met: . . .

(ii) The load shall not contact any obstruction.

Section 23–8.1(f)(1) also echoes section 240(1) in requiring the material to be in a sling or lifting device and section 23–8.1(f)(2) was also violated in that the pile that Gravatt and Liming were lifting was stuck in or came into contact with other debris piles, which caused or contributed to the slippage of the pile from the tongs and no tag or restraint line was used as required.

§ *23–8.2 Special provisions for mobile cranes.*

\* \* \* \* \* \*

(c) Hoisting the load. (3) ... Loads lifted by mobile cranes shall be raised vertically so as to avoid swinging during hoisting except when such operations are permitted by the capacity chart. A tag or restraint line shall be used when rotation or swinging of any load being hoisted by a mobile crane may create a hazard.

 Under the Scaffold Law and the other cited sections of the Labor Law, certain agents, such as engineers and architects, are not liable unless they supervise or control the work, or liability is imposed on them by clear contractual provision. *See Brooks v. A. Gatty Service Co.,* 127 A.D.2d 553, 554, 511 N.Y.S.2d 642, 643 (2d Dep't 1987). Section 240 states that "[n]o liability ... shall be imposed on professional engineers ... who do not direct or control the work other than planning and design." Massand's role went beyond planning and design. Massand is liable to Gravatt under § 240 of the New York Labor Law because it was the City's agent at the job site, contractually agreed to ensure that the work was performed in compliance with the Labor Law, and supervised and controlled the performance of the work and the condition of the job site. As found above, Massand had the contractual right, power, and duty to remedy unsafe practices and conditions at the job site, and on occasions exercised that responsibility. Massand gave safety orders to the men at the 145th Street Bridge and the men obeyed them. The exception to § 240 liability for engineers who do not direct or control the work does not apply to Massand at the 145th Street Bridge job site.

In the recent case of *Rizzuto v. L.A. Wenger Contracting Co., Inc.,* 91 N.Y.2d 343, 670 N.Y.S.2d 816, 693 N.E.2d 1068 (1998), the Court of Appeals reversed decisions that granted summary judgment on the issue of supervision and control. The plaintiff brought claims against Wenger under §§ 200 and 241(6) of the Labor Law, and alleged that Wenger "retained supervision and control of the construction...." 91 N.Y.2d at 347, 670 N.Y.S.2d at 818, 693 N.E.2d at 1070.

The lower courts dismissed the § 200 claim against Wenger because the "evidence failed to establish that the general contractor exercised supervisory control over the construction site or the work activity bringing about the injury." 91 N.Y.2d at 347, 670 N.Y.S.2d at 818, 693 N.E.2d at 1070. (The § 241(6) claim was also dismissed). The Court of Appeals reversed. With respect to the issue of job site supervision and control raised by the § 200 claim, the Court concluded that there was sufficient evidence to allow a jury to decide whether the general contractor supervised and controlled the work.

In *Rizzuto,* the general contractor "interacted with the foreman to ensure that the physical work progressed in accordance with the plans, specifications and safety rules." 91 N.Y.2d at 352, 670 N.Y.S.2d at 821, 693 N.E.2d at 1073. Here, S & B regulated or coordinated use of the job site which fulfilled a "safety factor" for the benefit of the employees at the job site. 91 N.Y.2d at 352–53, 670 N.Y.S.2d at 821, 693 N.E.2d at 1073. Massand also performed this type of activity, *i.e.,* it supervised the work and directed the workers to take safety precautions. It also had this duty under the contract.

In *Rizzuto,* the Court of Appeals also noted that "it is inferable that the defen-

dant knew or should have known of the danger to the plaintiff" caused by working conditions at the job site. 91 N.Y.2d at 353, 670 N.Y.S.2d at 821, 693 N.E.2d at 1073. Such evidence "would have permitted the jury to rationally conclude that defendant possessed the requisite supervisory control over that portion of the work activity bringing about the injury to enable it to prevent the creation of the unsafe condition or plaintiff's exposure to it." 91 N.Y.2d at 353, 670 N.Y.S.2d at 821, 693 N.E.2d at 1073. Gravatt established that Massand knew or should have known of S & B's hazardous practice of mixing new and old material on the same barge, and knew or should have known of the dangerous use of timber tongs.

### The Gravatts are Entitled to Recovery Against S & B Under the LHWCA and Maritime Law

■ S & B was negligent and is liable to Gravatt under Section 905(b) of the LHWCA.

Section 905(b) provides:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void....

The 905(b) negligence action against the vessel was created by Congress when it amended the LHWCA in 1972. *See Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). With the 1972 amendments, Congress increased the benefits payable to an injured worker, abolished the worker's strict liability cause of action against the vessel, and insulated the employer from third party liability to the vessel for the worker's injury. *See Id.* at 165, 101 S.Ct. 1614. In this case, S & B

acted as a "dual capacity" vessel owner, both as a vessel owner and as Gravatt's employer. In *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983), the Supreme Court held that a dual capacity employer is liable in tort for injuries sustained by its employees on its vessels. Having determined that vessels are liable to longshore and harbor workers for negligence, Congress left it to the courts to determine the contours of vessel negligence through the ordinary process of litigation. *See Scindia*, 451 U.S. at 165–66, 101 S.Ct. 1614. *Scindia* held that vessel liability under § 905(b) arises in three circumstances:

(1) The owner is liable if, on turning over the ship to the stevedore, it fails to warn of hidden defects which the owner should have known about. This is known as the "turn over duty."

(2) The owner is liable for injury caused by hazards under the control of the ship. This is the "active control duty."

(3) The owner is liable if it fails to intervene in the stevedore's operations when the owner has actual knowledge both of the hazard and that the stevedore, in the exercise of "obviously improvident" judgment, means to continue to work notwithstanding and, therefore, cannot be relied on to remedy the danger. This is the "duty to intervene."

■ According to S & B, it was a negligent "employer," not a negligent "vessel owner," and was entitled to rely on itself as an expert stevedore, and its "expertise" as stevedore insulated it from liability under § 905(b). However, in this Circuit, a dual capacity defendant is liable in its capacity as vessel owner for failing to provide workers aboard the vessel with a safe place to work. *See Fanetti v. Hellenic Lines, Ltd.*, 678 F.2d 424 (2d Cir.1982); *Napoli v. [Transpacific Carriers, Etc.] Hellenic Lines*, 536 F.2d 505 (2d Cir.1976). In *Fanetti*, the Second Circuit answered

the question of whether a shipowner choosing to act as its own stevedore is entitled to insulation from liability, partial or total, which hiring an independent stevedore might otherwise afford. The Second Circuit answered that question in the negative, affirmed a verdict in favor of the plaintiff, and held that a shipowner choosing to act as its own stevedore is not entitled to insulation from liability under the LHWCA. S & B as vessel owner in this case, acted as its own stevedore, and any negligence on its part is actionable vessel owner negligence under 905(b).

In *Fanetti*, the Second Circuit relied on the reasons stated by the Court in *Napoli*, 536 F.2d 505, 508 (2d Cir.1976):

> [A] charge which relieves a shipowner of liability for a dangerous condition which was "known to the stevedore or to any of its employees" is clearly inappropriate where the shipowner, itself, is the stevedore.

In his dissenting opinion in *Canizzo v. Farrell Lines, Inc.*, 579 F.2d 682, 689–90 (2d Cir.1978), Judge Friendly reasoned:

> Where, as in [Napoli], there is no independent contractor, it is part of the ship's duty to exercise reasonable care to inspect its own workers' workplace, to remove grease spills, etc. In such a case there is no "independent contractor" with primary responsibility upon whom the ship may properly rely.... Things are very different when the longshoreman works for an independent stevedore who has primary responsibility for the workplace.

Judge Haight in *Fanetti* stated that trial judges should not be required:

> [T]o give juries instructions about the shipowner's right to rely upon an expert contractor who, in fact, was not there. The concept is schizophrenic and the predictable effect upon the jury one of bafflement. The Supreme Court itself, in the later case of *Scindia Steam & Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1

(1981), emphasized that "the legal duties placed on the stevedore and the vessel's justifiable expectations that those duties will be performed are relevant in determining whether the shipowner has breached its duty." *Id.* at 176, 101 S.Ct. at 1626. Implicit in that analysis is the existence of an independent, expert stevedore upon whom the shipowner's "justifiable expectation" may reasonably fall.

*Fanetti*, 678 F.2d at 430.

S & B again has urged the Court follow the First Circuit's holding in *Morehead v. Atkinson–Kiewit, J/V*, 97 F.3d 603 (1st Cir.1996). The *Morehead* Court wrote, however, that:

> [T]he duties of care described in *Scindia* should be applied in dual capacity cases *insofar as the facts allow*. To do so, a court may have to divide the employer-shipowner into a hypothetical independent employer and independent vessel owner, each separately holding the duties allocated under principles suggested in *Scindia*. A court may sometimes be assisted in the process by the defendant's internal employment arrangements assigning certain personnel to the "vessel" side of its operation. *On occasion, however, the duties and work arrangements pertaining to a suing harbor worker may be so foreign to those in Scindia's stevedoring context that Scindia's analysis will become no more than a point of departure.*

*Morehead*, 97 F.3d at 613 (emphasis added).

Even under *Morehead*, S & B as vessel owner had active control over the vessel and its cargo of debris and new material, and knew or should have known about the hazards created when commingling debris and new material and the potential for injury-causing accidents to occur, making it liable under *Scindia* standards. S & B did not exercise ordinary care in keeping its debris/material barge, crane barge, and vessel equipment in a condition that would permit its workers, who were not expert and experienced stevedores, to carry on

cargo operations safely. *See, e.g., Moore v. M.P. Howlett,* 704 F.2d 39 (2d Cir.1983). S & B failed to fulfill its *Scindia* duty to intervene and correct the hazardous condition created by commingling the debris and good materials on its barges and the use of timber tongs. *Morehead* also holds that the *Scindia* duty arising from active control over a hazardous condition is triggered when the dangerous condition is on the vessel itself. *See Morehead,* 97 F.3d at 613. S & B as vessel owner, had active control over the debris obstructing the new material that was loaded on the barge and breached *Scindia*'s "active control" duty in causing and permitting the debris and good material to be commingled, as well as for allowing timber tongs to be used to move debris.

■■■ S & B has contended that Gravatt's 905(b) claim is barred by the "fellow servant" rule, a defense not explicitly raised in the S & B pretrial order or at trial. Federal rule 8(c) requires a party to plead certain affirmative defenses, including "injury by fellow servant." Fed. R.Civ.P. 8(c), and therefore could be said to have been waived. *See Doubleday & Co. v. Curtis,* 763 F.2d 495, 503 (2d Cir. 1985). Further, the defense offered by S & B is not supported by the authorities.

The fellow servant rule arose in England in 1837, *i.e.,* during the Industrial Revolution, out of a "social philosophy and an attitude toward labor, which are long since outmoded." W.P. Keeton, *Prosser And Keeton On the Law of Torts,* 569 (5th ed.1984) (hereinafter "Prosser").

> The rule that the employer was not liable for injuries caused solely by the negligence of a fellow servant first appeared in England in 1837, and almost immediately afterward in the United States ... The explanation of the rule probably lay in the highly individualistic viewpoint of the common law courts, and their desire to encourage industrial undertakings by making the burden upon them as light as possible.

The general rule thus declared was later restricted in a number of respects, as its hardship upon labor became apparent. Prosser, at 571–72.

Section 905(b) contains a limited fellow servant defense:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person ... may bring an action against such vessel as a third party .... if such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer ...

The first sentence of 905(b) states the general rule that workers covered by the LHWCA can sue vessels for negligence. *See Guilles v. Sea–Land Service, Inc.,* 12 F.3d 381, 385 (2d Cir.1993). by judicial interpretation, this sentence allows longshoremen and harbor workers to sue their employers who are also vessel owners. *Guilles,* 12 F.3d at 386 (citing *Jones,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768).

The second and third sentences of 905(b) allow the fellow servant defense to some of the negligence actions permitted against vessels in the first sentence of 905(b). *See Guilles,* 12 F.3d at 386.

■■■ Section 905(b) recognizes the fellow servant defense in four classes of workers: longshore workers/stevedores, ship builders, ship repairers, and ship breakers. *See Smith v. Eastern Seaboard*

*Pile Driving, Inc.*, 604 F.2d 789, 795 (2d Cir.1979). "Section 905(b) bars any action against the shipowner by a longshoreman, repairman, or shipbuilder who is injured as a result of the negligence of other employees performing similar services." *Id.* at 795. Despite the defense, the vessel remains liable for the full amount of the loss if its negligence contributed to the injury. *Smith*, 604 F.2d at 795–96.

However, Gravatt does not fall into any of the four worker categories that permit the fellow servant defense. Gravatt was a carpenter, *i.e.*, a dockbuilder hired as a pile driver to work on a bridge and belonged to the carpenters union. Even if the defense applies, vessel owner negligence caused the accident. Gravatt was not a longshoreman, did not work for a stevedore, and was not hired to provide stevedoring services. Gravatt was not a ship builder, repairer, or breaker.

S & B seeks to expand the fellow servant rule to cover workers who do not fall within one of the four classes of workers identified in 905(b). The Second Circuit refused to address this contention in *Smith*. "We need not now decide whether the § 905(b) exclusion applies to land-based personnel other than those in the three enumerated groups." *Smith*, 604 F.2d at 797. (*Smith* speaks of three enumerated groups, instead of four because it was written before 905(b) was amended in 1984).

*Smith* was decided in 1979, *i.e.*, before *Scindia* and *Fanetti* and before the 1984 amendments to § 905(b). The 1984 amendments altered 905(b) by narrowing the availability of negligence claims against vessels in certain dual capacity cases. Congress barred employees providing "shipbuilding, repairing, or breaking services" from suing the owner-employer in any capacity. In doing so, congress specifically stated that 905(b), as amended, should "not be construed to limit an employee's right to bring a cause of action, except in the circumstances indicated within the language." H.R.Rep. No. 98–570(1)

at 7 (1984), reprinted in 1984 U.S.C.A.N.N. 2734, 2741. Congress does not expect courts to expand the fellow servant rule by implication.

The Second Circuit has read the 1984 amendments to 905(b) as a limitation on the classes of employees precluded from suing dual capacity owners.

> The 1984 change now in effect, preventing in all circumstances shipbuilders and repair personnel from recovering for negligence from an employer-vessel, shows that Congress knew how to preclude a class of employees from being able to sue an employer-vessel if it chose to do so. By stipulation, it is agreed that Guilles [the plaintiff] is not among that class, and that class to which he belongs, harborworkers, is not specifically precluded form the cause of action.

*Guilles*, 12 F.3d at 386 (footnote omitted).

As a harborworker, *i.e.*, a carpenter or dockbuilder, Gravatt is not specifically precluded from suing his vessel owning employer. The 1984 amendments to 905(b) and the Second Circuit's decision in *Guilles* defeat S & B's attempt to expand the fellow servant defense into classes of workers not clearly identified in 905(b).

Here, in any case, Gravatt is entitled to recover against S & B because the injuries were caused by S & B in its capacity as vessel owner. *See Smith*, 604 F.2d at 796–97.

In *Smith*, the plaintiff's decedent was a diver/ship repairer (one of the categories of workers subject to the fellow servant rule) who drowned while attempting to perform an underwater survey of a dredge. The district court dismissed 905(b) claim because it:

> considered the case to be governed by the clause in § 905(b) which immunizes a shipowner from a damage action by an employee who is injured while doing longshoring, ship building or repair work as a result of the negligence of

other employees of the vessel involved in the same activities.

*Smith,* 604 F.2d at 793.

▇▇ Even if a fellow servant caused the injury, the injured worker may still recover in full from the vessel owner-employer if the owner-employer contributed to the cause of the injury. *See id.* at 795–96. In this connection, under *Smith,* the court must determine whether the negligent acts were committed by employees acting for the vessel.

In *Smith,* the district court concluded that the worker died as a result of the negligence of co-workers who were engaged in the same ship repairing activity. *Id.* at 795–96. The Court of Appeals reversed:

> The acts and omissions found to constitute actionable negligence all took place prior to the actual dive and were akin to a failure to provide a safe place to work. The absence of a rescue plan, the improper placement of emergency apparatus, and the failure to provide a ladder or platform were all defects in the general operation of the tug, and it is merely fortuitous that they came to light during a dive that was part of a repair program. Furthermore, it cannot be said that the responsibility for providing a safe vessel from which to dive was at any time delegated to employees acting primarily as repairmen. Mutch, the president of Eastern, was in command throughout the operation, and may be charged with knowledge of the deficiencies that led to the accident. Although Eastern might have escaped liability if it had surrendered control over the operation to a subcontractor that could supply and supervise its own divers, that course was not chosen.

604 F.2d at 796 (footnote omitted).

S & B's negligence preexisted the date of the injury. The decision to mix debris and new material and to use timber tongs as hoisting equipment was made by S & B's supervisory personnel and were consistent practices adopted prior to the accident.

Under *Fanetti,* 678 F.2d at 430, when an owner-employer does not use an independent stevedoring contractor to load, unload, or restow cargo, the owner-employer is liable to the worker for injuries caused by the owner-employer's negligence. There is no need to determine whether the acts of negligence are attributable to the owner-employer in its capacity as owner or as employer.

S & B as a dual capacity employer, acted as a vessel owner under *Fanetti,* and is, therefore, liable for the negligent acts and dangerous conditions which caused Gravatt's injuries.

Gravatt's claims against the City and Massand are not governed by maritime law. However, even if, as the defendants allege, maritime law applied, the City and Massand would be negligent and liable to Gravatt under general maritime law. *See Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). They exercised supervision and control over the job site, were on notice of unsafe conditions and practices generally, the improper use of timber tongs, the hazardous mixing of debris and new material on the same barge and failed to train their men properly.

### Gravatt Is Not Liable For Contributory Negligence

As the Opinion found and the testimony established, and as stated in the companion opinion, Gerhard Holzheuer ("Holzheuer") was the S & B foreman directly supervising Gravatt and his co-worker, Thomas Liming ("Liming"), and Gravatt and Liming were complying with Holzheuer's direction to use timber tongs to move old pilings in order to gain access to a new draft of lumber which was to be moved. The old pilings slipped, the load fell, and Gravatt was consequently struck as set forth in the Opinion at pages 406–407.

A correct interpretation of the cases cited in the Opinion compels the conclusion that an injured worker following the orders of his supervisor is not contributorily negligent, and any award for damages should not thereby be reduced as a consequence of his acts.

In *Fuszek v. Royal King Fisheries*, 98 F.3d 514 (9th Cir.1996), the plaintiff, a Jones Act seaman, was injured on board a fishing vessel while operating a fish processing machine. The plaintiff reached into the machine while it was operating (a dangerous practice implemented by his employer) and seriously cut his hand. The Court reduced plaintiff's award by twenty-five percent for contributory negligence. The Court of Appeals in reversing held that the plaintiff's recovery should not be reduced because the vessel owner maintained the vessel's equipment in violation of safety regulations. Although *Fuszek* involved a seaman protected by the Jones Act rather than a harbor worker protected by the LHWCA, it stands for the principle that a worker is not liable for injuries caused by following orders, as does *Simpson v. Royal Rotterdam Lloyd*, 225 F.Supp. 947 (S.D.N.Y.1964). There the plaintiff was a longshoreman who was injured on the defendant's vessel while unloading cargo in Brooklyn. He fractured his ankle when a 100 pound tin ingot fell on his foot during unloading operations. The Honorable Wilfred Feinberg, then a District Judge, stated "There was no contributory negligence on the part of the plaintiff. He was in the hold working *pursuant to instructions*." 225 F.Supp. at 950 (emphasis added).

Based on the facts found above and the authorities set forth, no contributory negligence can be attributed to Gravatt who was following a direct order of a supervisor causally related to his injury.

### Gravatt is Entitled to Compensatory Damages from the City and Massand

■ Based on the facts found above Gravatt is entitled to compensatory damages from S & B and Massand. As against Massand, Gravatt's compensatory damages are calculated according to New York State Law. Under New York law, the trier of fact is to calculate lost income without reduction to present value and without deducting for income taxes. CPLR § 4111(f); *Lanzano v. New York*, 71 N.Y.S.2d 208, 524 N.Y.S.2d 420, 519 N.E.2d 331 (1988), *recons. den.*, 71 N.Y.2d 890, 527 N.Y.S.2d 772, 522 N.E.2d 1070 (1988).

### Gravatt is Entitled to an Award for Pain and Suffering

Based on the facts found above Gravatt is entitled to an award for pain and suffering. As discussed above, Gravatt's past pain and suffering would be fairly compensated by an award of $300,000. He will also endure pain and suffering in the future for the next twenty-five years for which he should be compensated in the amount of $200,000.

### Gravatt is Entitled to Punitive Damages an Against Massand and S & B

■ The parties do not dispute that punitive damages are not available against the City. *See Sharapata v. Town of Islip*, 56 N.Y.2d 332, 437 N.E.2d 1104, 452 N.Y.S.2d 347 (1982). The issue remains as to whether Gravatt is entitled to punitive damages against Massand and S & B.

■ Under New York State law, punitive damages are available against parties whose acts or omissions amount to "willful or wanton conduct which demonstrates a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard...." *Dubecky v. S2 Yachts, Inc.*, 234 A.D.2d 501, 502, 651 N.Y.S.2d 602, 604 (1996) (quoting, *Home Ins. Co. v. American Home Prods. Corp.*, 75 N.Y.2d 196, 203–204, 551 N.Y.S.2d 481, 485–86, 550 N.E.2d 930, 934–35 (1990)). Federal law is similar. Under federal law, punitive damages are available against parties whose actions constitute "gross negligence, or actual malice or criminal indifference which is the equivalent of

reckless and wanton misconduct." *In Re Marine Sulphur Queen,* 460 F.2d 89, 105 (2d Cir.1972); *CEH Inc. v. F/V SEAFARER,* 70 F.3d 694, 699 (1st Cir.1995) (punitive damages available against those who show a conscious disregard for the rights of others).

■ Massand and S & B demonstrated a reckless disregard for the safety of the construction workers at the 145th Street Bridge job site. They knew that the men were working unsafely. S & B's superintendent told the City's project engineer, who raised safety concerns, that the men worked dangerously because that is how the job got done. The superintendent told the crane operator that if they obeyed the safety rules contained in the safety memos, they would never finish the work. The shop steward at the job site had complained about safety to both Massand and S & B. Massand closed its eyes to the dangerous activities and conditions at the job site. Although it contractually assumed responsibility for the safety of the workers, Massand did nothing at all to learn about construction site safety. Even after Massand became aware that too many personnel accidents were occurring at the job site, it did not implement any changes or improvements to safety supervision or even take the basic step of training its men.

While the complete disregard for safety of both S & B is inexcusable, S & B is the more culpable party and its conduct, being reckless and wanton, merits an award of punitive damages. Unfortunately, however, the law prohibits an award of punitive damages against S & B in this case.

Massand and S & B rely on the reasoning of the Supreme Court's decision in *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), and dicta in the Second Circuit's decision in *Wahlstrom v. Kawasaki Heavy Industries Ltd.,* 4 F.3d 1084 (2d Cir.1993), for the proposition that punitive damages are not available in cases brought under general maritime law. While punitive damages against S & B are not appropriate in the instant case, Massand and S & B overstate the Supreme Court's holding in *Miles.*

In *Miles,* the Court held, *inter alia,* that damages recoverable in an action for the wrongful death of a seaman do not include loss of society. *See Miles* 498 U.S. at 37, 111 S.Ct. 317. In reaching this conclusion, the Court articulated principles of uniformity relevant to wrongful death actions, and more generally, to maritime tort law, which have moved subsequent courts to limit recovery in other similar contexts. *See e.g., CEH, Inc. v. FV Seafarer,* 148 F.R.D. 469, 472 (D.R.I.1993) (collecting cases). The Supreme Court's decision in *Miles,* however, does not enunciate an absolute bar to recovery of punitive damages in all general maritime cases. Indeed, *Miles* does not signify a call for "universal uniformity of maritime tort remedy," but rather "emphasizes the importance of uniformity in the face of applicable legislation." *CEH, Inc. v. FV Seafarer,* 70 F.3d at 700. The concern expressed in *Miles* was not with respect to nonpecuniary damages in maritime cases in general, but with inconsistency with statutory law: "[i]n this era, an admiralty court should look primarily to these legislative enactments for policy guidance .... [and] must be vigilant not to overstep the well-considered boundaries imposed by federal legislation." *Miles,* 498 U.S. at 27, 111 S.Ct. 317. As the Supreme Court later held in *Yamaha Motor Corp., U.S.A. v. Calhoun,* 516 U.S. 199, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996), "[w]hen Congress has prescribed a comprehensive tort recovery regime to be uniformly applied, there is no cause for enlargement of the damages statutorily provided." 516 U.S. at 215, 116 S.Ct. 619.

It would be anomalous under these facts to conclude that a remedy under general maritime law and state statute and punitive damages are available against S & B for the reasons set forth in the companion opinion and repeated here.

The issue of the availability of punitive damages has now been more precisely illuminated by the parties. The issue is difficult and close, and distinguished judges in this district have reached contrary results, the Honorable Bernard Newman concluding that punitive damages are not available in *Cochran v. A/H Battery Associates*, 909 F.Supp. 911, 920–23 (S.D.N.Y.1995) (Judge Newman also concluded the proof did not support the punitive damage claim), and the Honorable Jed B. Rakoff reaching the same conclusion in *O'Hara v. Celebrity Cruises, Inc.*, 979 F.Supp. 254 (S.D.N.Y. 1997), while the Honorable Allen G. Schwartz denied a motion to strike a similar punitive damage claim in a maritime cause in *Taylor v. Costa Cruises, Inc., et al.*, 90 Civ. 2630(AGS), unreported opinion, filed March 14, 1996, relying on his analysis of *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996).

Both the Gravatts and S & B agree on the legal issue, *i.e.*, whether an award of punitive damages is permissible under general maritime law in a case involving non-fatal injuries to a harbor worker. S & B contended that *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) and cases interpreting it, including *Wahlstrom v. Kawasaki Heavy Industries, Ltd.*, 4 F.3d 1084 (2d Cir.1993), bar a punitive damages recovery under the general maritime law, and in the Opinion it was concluded that under the LHWCA the same conclusion should be reached. However, the Opinion also concluded that *Miles* does not preclude an award of punitive damages on all claims arising under the general maritime law.

On closer examination, it is now concluded *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), and *Kawasaki*, 4 F.3d 1084, do not compel acceptance of S & B's argument. *Kawasaki* involved a wrongful death action of a pleasure boat operator, *i.e.*, not a traditional seaman or harbor worker. This Court concluded in the Opinion:

Massand and S & B rely on the reasoning of the Supreme Court's decision in *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), and dicta in the Second Circuit's decision in *Wahlstrom v. Kawasaki Heavy Industries Ltd.*, 4 F.3d 1084 (2d Cir.1993), for the proposition that punitive damages are not available in cases brought under general maritime law. While punitive damages against S & B are not appropriate in the instance case, Massand and S & B overstate the Supreme Court's holding in *Miles*.

In *Miles*, the Court held, *inter alia*, that damages recoverable in an action for the wrongful death of a seaman do not include loss of society. *See Miles*, 498 U.S. at 37, 111 S.Ct. 317. In reaching this conclusion, the Court articulated principles of uniformity relevant to wrongful death actions, and more generally, to maritime tort law, which have moved subsequent courts to limit recovery in other similar contexts. *See e.g., CEH, Inc. v. FV Seafarer*, 148 F.R.D. 469, 472 (D.R.I.1993) (collecting cases). The Supreme Court's decision in *Miles*, however, does not enunciate an absolute bar to recovery of punitive damages in all general maritime cases. Indeed, *Miles* does not signify a case for "universal uniformity of maritime tort remedy," but rather "emphasizes the importance of uniformity in the face of applicable legislation." *CEH, Inc. v. FV Seafarer*, 70 F.3d at 700. The concern expressed in Miles was not with respect to nonpecuniary damages in maritime cases in general, but with inconsistency with statutory law; "[i]n this era, an admiralty court should look primarily to these legislative enactments for policy guidance ... [and] must be vigilant not to overstep the well-considered boundaries imposed by federal legislation." *Miles*, 498 U.S. at 27, 111 S.Ct. 317. As the Supreme Court later held in *Yamaha Motor Corp. U.S.A. v. Calhoun*, 516 U.S. 199,

116 S.Ct. 619, 133 L.Ed.2d 578 (1996), "[w]hen Congress has prescribed a comprehensive tort recovery regime to be uniformly applied, there is no cause for enlargement of the damages statutorily provided." 516 U.S. at 215, 116 S.Ct. 619.

Opinion at pages 425–426.

The anomaly of allowing punitive damages against Massand and not against S & B was recognized but it was concluded that the LHWCA, as a worker's compensation scheme, compelled this result. However, the legislative history of the LHWCA casts doubt on that conclusion. Congress apparently anticipated that the 905(b) action would place the vessel owner in the same position as a land-based third-party.

> The purpose of the [1972] amendments [to the LHWCA] is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as "unseaworthiness," "non-delegable duty," or the like.

H.R.Rep. 92–1441, at 4703 (1972).

It thus appears that Congress did not intend to create the anomalous result reported in the Opinion. Indeed, in *Miles,* a seaman was murdered aboard ship in state territorial waters. A claim for both survival and wrongful death damages alleged negligence under the Jones Act and for unseaworthiness under general maritime law.

The Supreme Court held that a non-dependent parent cannot recover loss of society damages and that the decedent's lost future income is not recoverable to the estate. The Supreme Court ruled that the applicable federal statutes, Death on the High Seas Act, 46 U.S.C. § 761 *et seq.* ("DORSA") and the Jones Act, 46 U.S.C.A. § 688, limit damages to "pecuniary loss" in seamen's wrongful death and survival actions and, thus, precluded the murdered seaman's mother from recovering "nonpecuniary loss, such as loss of society," in a general maritime law action. *Miles,* 498 U.S. at 20, 111 S.Ct. 317, *quoting, Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974).

The Second Circuit in *Kawasaki,* where non-dependent parents of a recreational boater sued for non-pecuniary damages held that non-pecuniary loss of society damages were not available to non-dependent parents under general maritime law. Turning to punitive damages, the Second Circuit held that punitive damages, like loss of society, are "non-pecuniary" and, therefore, are unrecoverable in a wrongful death action based on general maritime law. The Court stated:

> We are in general agreement with the view that plaintiffs who are not allowed by general maritime law to seek nonpecuniary damages for loss of society should also be barred from seeking non-pecuniary punitive damages.

446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 *Kawasaki,* 4 F.3d at 1094.

The Gravatts contend that the corollary to this rule is that plaintiffs who are entitled to seek non-pecuniary damages for loss of society should be allowed to seek non-pecuniary punitive damages, citing *American Export Lines v. Alvez,* 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980) where it was held that non-pecuniary loss of society damages are available to the spouse of a harbor worker injured in state territorial waters:

> The question in this case is whether general maritime law authorizes the wife of a harbor worker injured *nonfatally* aboard a vessel in state territorial waters to maintain an action for damages for the loss of her husband's society. We conclude that general maritime law does afford the wife such a cause of action.

*Alvez,* 446 U.S. at 275–76, 100 S.Ct. 1673.

In the interest of congruence between state and federal law under the authorities

cited above, and the requirements of justice under the particular facts of this case driven by questions of coverage, the conclusion stated in the Opinion must be amended to grant judgment against S & B on behalf of Gravatt on his claim for punitive damages.

Having previously concluded Massand's liability to be $200,000 and S & B to have more culpability than Massand (Opinion, pages 425–426), an award of $400,000 in punitive damages against S & B is appropriate. As set forth in the Findings of Fact in the Opinion, while Massand's principal dereliction was its failure to comply with contractual and statutory requirements and to provide inspection, particularly at the time of the action (Opinion, pages 403–405, 407), S & B's reckless conduct included not only the failure to meet the relevant safety requirements, but the particular instruction to use an unsafe procedure which resulted in the injury to Gravatt (Opinion, pages 398–402, 408–409).

As to Massand, under the facts found above, Gravatt has met his burden of proof under both state and federal law. Massand's deliberate indifference to the safety requirements imposed upon it by law and contract constitutes wanton and malicious conduct. Accordingly, Massand is liable for punitive damages in the amount of $200,000. *See In Re Marine Sulphur Queen*, 460 F.2d at 105; *Dubecky*, 234 A.D.2d 501, 502, 651 N.Y.S.2d 602, 604.

**The City is Entitled to Indemnity from S & B and Massand Under Their Contracts**

For the reasons set forth in the Opinion of April 6, 1998, the City is entitled to contractual indemnity.

**Massand is Not Entitled to Contribution from S & B**

■ While both S & B and Massand bear responsibility for the damages to Gravatt and Mrs. Gravatt resulting from their

torts, Massand, who is less culpable than S & B, has no right of contribution against S & B.[3] Pursuant to Section 11 of the Workers' Compensation Law, as amended on September 10, 1996, third parties are barred from seeking indemnification or contribution from an injured plaintiff's employer absent a showing that that employee sustained a "grave" injury as defined by the statute. *See* Workers' Compensation Law § 11; *Majewski v. Broadalbin–Perth Central School Dist.*, 696 N.E.2d 978, 91 N.Y.2d 577, 673 N.Y.S.2d 966 (1998). Section 11 defines "grave" injury to include:

> death, permanent and total loss of use or amputation of an arm, leg, hand or foot, loss of multiple fingers, loss of multiple toes, paraplegia or quadriplegia, total and permanent blindness, total and permanent deafness, loss of nose, loss of an ear, permanent and severe facial disfigurement, loss of an index finger or an acquired injury to the brain caused by an external physical force resulting in permanent total disability.

Here, there is no dispute that Gravatt did not suffer a "grave" injury as defined by the statute.

■ In addition, as noted in the April 6 Opinion, the exclusivity provision in § 905(a) prohibits tort-based contribution: "[O]nce an employer fulfills its obligations under the Act by paying out benefits to the injured LHWCA employee, further tort-based contribution from the employer is foreclosed." 1998 WL 171491 at *22 (quoting *Triguero v. Consolidated Rail Corp.*, 932 F.2d 95, 98 (2d Cir.1991)).

**The Terms of the Judgment**

Gravatt is entitled to interest at nine (9%) percent on the award from the date of this Court's April 6, 1998 decision on summary judgment. *See Love v. State*, 78 N.Y.2d 540, 577 N.Y.S.2d 359, 583 N.E.2d 1296 (1991).

---

**3.** This Court has held previously that Massand is not entitled to indemnity against S & B. *See*

1998 WL 171491 at *22.

Once the judgment is entered and the precise pre-judgment interest calculation is made to determine the exact value of the judgment, Gravatt is entitled to post-judgment interest at nine (9%) percent per annum until it is paid. CPLR § 5004. This rate follows the rate used by the State of New York. It is higher than the rate earned on United States Treasury Bills since January 31, 1996, but certainly less than the return a prudent investor would have earned since that date.

Gravatt's 905(b) action against S & B is governed by federal law, which requires the reduction of Gravatt's economic damages to present value based on net income. Federal law considers the tax consequences of an award and uses net income to calculate lost future income. *See Fanetti,* 678 F.2d at 431. "Focusing upon after-tax earnings is an exercise in economic fairness; by this decision we extend it at least to all federal law claims for future lost wages." *Id.* at 431. State law, however, does not give the tortfeasor the benefit of the victim's tax savings. *See Louissaint v. Hudson Waterways Corp.,* 111 Misc.2d 122, 443 N.Y.S.2d 678 (1st Dep't 1981) (analyzing cases). "[A] deduction of income taxes from future earnings is not called for in a personal injury case applying state law." *Hudson Waterways,* 111 Misc.2d at 128, 443 N.Y.S.2d at 682. Gravatt is also entitled to an award for pain and suffering under federal law.

Under federal law, Gravatt is entitled to pre-judgment interest on the award of damages from the date of injury to the entry of judgment at a rate left to the discretion of this Court. *See McCrann v. U.S. Lines,* 803 F.2d 771; *Taliercio v. Compania Empressa Lineas Argentina,* 761 F.2d 126, 129 (2d Cir.1985) The Court has elected to impose a rate of nine (9%) percent per annum. After entry of judgment, Gravatt is entitled to post-judgment interest pursuant to 28 U.S.C. § 1961(a).

The defendants are liable to Mrs. Gravatt for her damages for loss of consor-

tium. As against the City and Massand, she is entitled to pre-judgment interest on that amount at nine (9%) percent per annum from April 6, 1998. As against S & B she is entitled to pre-judgment interest on that amount at nine (9%) percent per annum from January 31, 1996. She is entitled to post-judgment interest against the City and Massand at nine (9%) percent from the date of entry of judgment and she is entitled to post-judgment interest against S & B pursuant to 28 U.S.C. § 1961(a) from the date of entry of judgment.

As to the damages resulting from joint tort liability and interest thereon, the defendants are jointly and severally liable.

### Conclusion

Based upon the revised revised findings of fact and conclusions of law set forth above, the Gravatts are entitled to judgment against the defendants, and the City is entitled to indemnity against S & B and Massand.

Settle judgment in accordance with this opinion as of June 15, 1999, upon ten (10) days notice.

It is so ordered.